CONSTRUCTORA BAUZÁ, INC., demandante y recurrente, *v.* LUIS GARCÍA LÓPEZ, demandado y recurrido.

*Número:* RE-87-504 *Resuelto:* 17 de diciembre de 1991

580

582

*José Elías Zayas*, abogado de la recurrente; *Luis E. Martir Lugo*, abogado del recurrido.

EL JUEZ ASOCIADO SEÑOR REBOLLO LÓPEZ emitió la opinión del Tribunal.

El Dr. Luis García López (Dr. García) contrató los servicios de la corporación Constructora Bauzá (Constructora) en relación con la construcción de una casa en un solar de su propiedad ubicado en la Calle Violeta de la Urb. San Francisco de Río Piedras, Puerto Rico. A esos efectos, el Dr. García y el presidente de Constructora, Sr. Claudio Bauzá, suscribieron un "Contrato de Construcción" en marzo de 1984. Según los términos del contrato, Constructora se comprometía a "construir el armazón estructural de la casa según el plano estructural y el 'rough-in' de plomería y electricidad supliendo todos los materiales y mano de obra necesarios para su ejecución, según las partidas descritas en el *Desglose para Pago ...*". Solicitud de revisión, Apéndice 4, pág. 18. A su vez, el Dr. García se comprometió a solicitar y obtener el permiso de construcción aprobado y expedido por la Administración de Reglamentos y Permisos (A.R.PE.) y dos (2) copias de los planos de la casa. Las partes convinieron en efectuar el mencionado contrato por el precio ajustado de ciento ochenta y cinco mil dólares ($185,000) y la conclusión de la obra en el término aproximado de cuatro (4) meses. Las partes acordaron que la construcción sería supervisada por un profesional competente designado por el Dr. García y que este último le pagaría a Constructora, mediante certificaciones semanales, tres (3) días después de ser éstas sometidas por Constructora, reteniendo el Dr. García el cinco por ciento (5%) del importe de los mismos hasta la entrega de la obra, la cual suma de dinero respondería por posibles defectos de construcción.

Sin haberse obtenido el mencionado permiso de A.R.PE.

y sin haberse satisfecho la póliza exigida por el Fondo del Seguro del Estado (F.S.E.) y los arbitrios municipales se comenzó la construcción de la obra a mediados del mes de abril de 1984 bajo la supervisión del Arq. Luis Arias Montalván. Tres (3) meses más tarde, a sugerencias del arquitecto Arias, el Dr. García decidió detener la obra para así poder evaluar la gravedad de unas *evidentes deficiencias* de las que adolecía la misma; contrató a esos fines al Ing. Ramón A. Pizzini Dávila y éste, a su vez, consultó con otros expertos en el campo, en especial el Ing. Héctor R. Rosario Cabrera y el arquitecto Picó Lacomba. Se llevaron a cabo pruebas de hormigón y de compactación, las cuales no se habían realizado anteriormente.(¹)

El ingeniero Pizzini al hacer la evaluación encontró, entre otras cosas, que habían detalles estructurales que no estaban conforme al plano, habían descuadres y la casa estaba "como torcida". Descubrió, en adición, que debido a que las columnas no habían sido construidas conforme al plano, algunas vigas habían quedado invertidas. Ante la realidad de que la corrección de los defectos requería la demolición de toda la obra e influenciado por el hecho de que se había obligado contractualmente a pagar el monto del contrato de decidir no continuarla, el Dr. García resolvió reanudar la misma.

Para esta fecha había transcurrido en exceso del tiempo originalmente pactado para la terminación de la construcción y aún faltaba mucho por hacer. Ante el retraso de Constructora, agravado por la suspensión de la obra, las partes acordaron "enmendar" el contrato de construcción. Se decidió hacer un nuevo plano conforme a lo construido (*as built*). Pactaron que la "entrega sustancial"(²) de la es-

---

(¹) Fue en ese momento que se pagaron la póliza del Fondo del Seguro del Estado (F.S.E.) y los arbitrios municipales, y se obtuvo el permiso de construcción.

(²) Según testimonio vertido en corte por la Arq. Istra Hernández de Bauzá, el término "entrega sustancial", conforme al contrato modelo del American Institute of Architects, admitido como *Exhibit* III de la parte recurrente, se refiere al momento

tructura sería el 3 de marzo de 1985 y se excluyó del contrato la construcción de la verja y la instalación del piso, acordándose un nuevo precio de ciento sesenta y seis mil doscientos dólares ($166,200). Convinieron, además, en que de entregarse la obra antes del plazo pactado se le otorgaría a Constructora un bono de doscientos dólares ($200) por cada día de adelanto y de entregarse la misma con posterioridad a la fecha establecida se le impondría a ésta una "multa" de doscientos dólares ($200) por cada día de atraso. Luego de corregirse por Constructora los defectos susceptibles de corrección, la obra se reanudó en agosto de 1984.

Durante el tiempo en que se efectuaba la obra, Constructora enviaba certificaciones al Dr. García y éste, *luego de la debida inspección por parte de los ingenieros Pizzini y Rosario*, enviaba el pago, siempre reteniendo el cinco por ciento (5%), y a veces más, de la suma facturada. En total, el Dr. García efectuó pagos a Constructora por la suma de ciento cincuenta y dos mil setecientos treinta y seis dólares con dos centavos ($152,736.02).

Hacia mediados de marzo de 1985, Constructora notificó al Dr. García que había concluido la obra en "forma sustancial". El ingeniero Rosario, en representación del Dr. García, envió comunicación escrita a Constructora —fechada el 4 de marzo de 1985— donde le sometió un listado de deficiencias y trabajos pendientes de terminar por lo cual entendía que la obra no estaba concluida en "forma sustancial". Las partes se reunieron el día 4 de abril de 1985. Como consecuencia de dicha reunión, Constructora accedió a corregir algunas de las deficiencias de la lista que se le sometió, arguyendo a su vez, que otras no eran de su responsabilidad. En específico, alegó que según el contrato estaba relevada de hacer las acometidas de alcantarillados

---

en que el dueño puede usar lo ya hecho para el propósito que lo mandó a construir. En este caso, el propósito era que pudieran actuar los otros contratistas en la obra para hacer sus respectivas labores.

y de agua potable. Indicó, además, que se le debían mil quinientos dólares ($1,500) por obras adicionales ya efectuadas.

Así las cosas, y estando ambas partes insatisfechas con el cumplimiento contractual de la otra, el Dr. García radicó demanda ante el Tribunal Superior de Puerto Rico, Sala de San Juan, por daños y perjuicios debido a un alegado incumplimiento del contrato de construcción. Alegó en la misma que Constructora había realizado una inconclusa y deficiente labor y que debido a ello existía una depreciación en el valor de su propiedad de sesenta mil dólares ($60,000). Sostuvo, en adición, que se había visto obligado a contratar los servicios de profesionales de la construcción para la inspección de la obra, así como a personas que le repararan los defectos de construcción y concluyeran la labor que Constructora venía obligada a realizar bajo el contrato celebrado. Alegó, además, que Constructora le adeudaba ocho mil ochocientos dólares ($8,800) por concepto de multas por tardanza en la entrega de la estructura y los gastos en que tuvo que incurrir en relación con la póliza del F.S.E. y los arbitrios municipales, los cuales le correspondía pagar a Constructora. Solicitó del tribunal que declarara con lugar su demanda y condenara a la parte demandada a resarcirle la suma de noventa y ocho mil cuatrocientos setenta y cuatro dólares con noventa y cinco centavos ($98,474.95), más seis mil dólares ($6,000) por concepto de honorarios de abogados.

Constructora contestó la demanda negando su responsabilidad y reconvino, adoptando por referencia todas las alegaciones contenidas en una demanda sobre cobro de dinero y daños y perjuicios que había radicado anteriormente contra el Dr. García ante la misma Sala de San Juan del Tribunal Superior. En dicha demanda exponía dos (2) causas de acción: en primer lugar, que el Dr. García le adeudaba cerca de quince mil quinientos dólares ($15,500) por concepto de materiales y trabajo de construc-

ción realizado y no pagado, y, en segundo término, aduciendo que la falta de pago por parte del demandado le había ocasionado daños a su reputación, pérdida de crédito con sus suplidores, la radicación de demandas en cobro de dinero en su contra y la virtual quiebra de su negocio de construcción. Ambas demandas fueron consolidadas. Luego de efectuado el correspondiente procedimiento de descubrimiento de prueba, se celebró la vista en su fondo del caso, la cual tuvo una duración de varios días.

El tribunal de instancia emitió sentencia en el caso; en la misma concluyó que Constructora nunca finalizó la obra que pactó realizar y que fueron trabajadores contratados posteriormente quienes terminaron la misma; resolvió que la fecha de la "entrega sustancial" de la obra fue el 15 de abril de 1985 y que por tanto, de acuerdo al "contrato enmendado", procedía la imposición de multas a Constructora; determinó, además, que durante las terminaciones de la obra resultaron *evidentes* una serie de deficiencias producto de la construcción inadecuada y defectuosa por parte de Constructora cuyo costo de reparación era de cuarenta y un mil quinientos veinte dólares ($41,520); finalmente concluyó que Constructora debió efectuar la labor de las acometidas sanitarias y, que de acuerdo a la prueba desfilada y al uso y costumbre en la industria de la construcción, el pago de la póliza del F.S.E. y de los arbitrios municipales era responsabilidad de Constructora. En consecuencia, declaró con lugar la demanda del Dr. García y sin lugar la de cobro de dinero instada por Constructora, imponiéndole a esta última el pago de cuarenta y un mil quinientos veinte dólares ($41,520) por concepto de daños y perjuicios, siete mil veintisiete dólares con veinte centavos ($7,027.20) por concepto de multas y tres mil dólares ($3,000) por concepto de gastos y honorarios de abogado.

Inconforme, Constructora acudió ante este Tribunal solicitando la revisión de la sentencia emitida por el tribunal de instancia, planteando cinco (5) señalamientos de error.

En síntesis, señala que el tribunal de instancia erró en su aplicación del derecho vigente al imponerle responsabilidad por vicios aparentes en la construcción luego de haber sido aceptada la obra y siendo, además, ésta una partida adicional al cinco por ciento (5%) pactado y retenido para los defectos. Plantea, en adición, que·erró el tribunal en su interpretación del contrato entre las partes; en determinar que la fecha de "entrega sustancial" lo fue el 15 de abril de 1985, y al concluir que le correspondía a Constructora el pago de la póliza del F.S.E. y los arbitrios municipales. Expedimos el auto de revisión solicitado. Estando en condiciones de resolver el recurso radicado, procedemos a así hacerlo.

I

■■■ Los hechos del presente caso nos colocan ante la figura jurídica del contrato de arrendamiento de obras, delineado por el Art. 1434 del Código Civil, 31 L.P.R.A. sec. 4013. A pesar de que en diversas oportunidades nos hemos manifestado en torno a la responsabilidad de las partes en un contrato de obra o construcción bajo otras disposiciones de nuestro código,[3] nunca antes habíamos tenido ocasión de estudiarlo conforme al citado Art. 1434. Dispone el mismo:

> En el arrendamiento de obras o servicios, una de las partes se obliga a ejecutar una obra, o a prestar a la otra un servicio por precio cierto. 31 L.P.R.A. sec. 4013.

■■■ En primer lugar, es preciso señalar que el Art. 1434 del Código Civil, ante, contempla dos (2) situaciones diferentes: el arrendamiento de servicios y el de obras.

---

[3] Véanse, a modo de ejemplo, *Empresas Capote, Inc. v. Tribunal Superior*, 103 D.P.R. 765 (1975); *Coop. de Viviendas v. Villas de Navarra*, 104 D.P.R. 718 (1976); *Gorbea v. Tribunal Superior*, 104 D.P.R. 138 (1975), y *Rivera v. Las Vegas Dev. Co., Inc.*, 107 D.P.R. 384 (1978).

Este último suele denominarse "contrato de obras" y según nos aclara Albaladejo, la diferencia entre ambos consiste en que en el de obras

> ... se promete un *resultado* [la obra hecha] con independencia del trabajo ... necesario para realizarlo; y en el segundo [el de servicios] se promete la prestación de los servicios en sí mismos —el dedicarse ... a las labores domésticas, por ejemplo— con independencia del resultado (de la cantidad de obra o de tarea) que con él se haya concluido. (Énfasis en el original.) M. Albaladejo, *Curso de Derecho Civil español común y foral*, Barcelona, Librería Bosch, 1977, T. II, págs. 450-451.

▬▬▬ Por nuestra parte, y adoptando básicamente la posición expuesta por Scaevola, hemos definido el "arrendamiento de obras" como esencialmente uno de trabajo, mediante el cual una de las partes se encarga de hacer una cosa para la otra, mediante un precio convenido entre ellos. *Empresas Capote Inc. v. Tribunal Superior*, 103 D.P.R. 765, 771 (1975). Ahora bien, no hay duda que el contrato de obra es uno de carácter consensual, bilateral y oneroso, cuyos elementos característicos son la obra a realizarse y el precio. M. Albaladejo, *Comentarios al Código Civil y compilaciones forales*, Jaén, Ed. Rev. Der. Privado, 1980, T. XX, Vol. 1, pág. 98; C. Berríos Rojas, *Apuntes sobre el contrato de construcción*, XIII (Núm. 3) Rev. Jur. U.I.A. 461, 463 (1979).

▬▬▬ Por definición, los contratos de construcción de edificios, como el que nos ocupa en el caso de autos, son contratos de obra bajo el Art. 1434 del Código Civil, ante. En estos casos una parte, generalmente denominada "contratista", se compromete a realizar y entregar una obra o construcción según la misma fue contratada, mientras que la otra parte, el dueño, se obliga a pagar el precio convenido en la forma y el tiempo así pactado. El incumplimiento total o parcial de las prestaciones a las que se han obligado las partes sujetará las mismas a las sanciones que a esos efectos provee el Código Civil.

 Como es sabido, el contrato, cuando es legal, válido y carente de vicios del consentimiento, es la ley entre las partes y debe cumplirse a tenor del mismo. Art. 1044 del Código Civil, 31 L.P.R.A. sec. 2994; *Cervecería Corona v. Commonwealth Ins. Co.*, 115 D.P.R. 345 (1984). Es por ello que el Art. 1054 del Código Civil, 31 L.P.R.A. sec. 3018, sujeta a aquellos que de alguna manera contravengan sus obligaciones a la indemnización de los daños y perjuicios causados. Bajo dicho supuesto, todo incumplimiento contractual dará lugar a un resarcimiento.

 Para el caso de obligaciones recíprocas, como es el contrato de obra, el Art. 1077 del Código Civil, 31 L.P.R.A. sec. 3052, provee:

> *Sec. 3052. Derecho de resolver obligaciones recíprocas*
> La facultad de resolver las obligaciones se entiende implícita en las recíprocas, para el caso de que uno de los obligados no cumpliere lo que le incumbe.
> *El perjudicado podrá escoger entre exigir el cumplimiento o la resolución de la obligación, con el resarcimiento de daños y abono de intereses en ambos casos.* También podrá pedir la resolución, aun después de haber optado por el cumplimiento, cuando éste resultare imposible. (Énfasis suplido.)

 Hemos indicado que el Art. 1077 del Código Civil, ante, establece una condición resolutoria tácita en todo contrato bilateral *que opera "ex proprio vigore"*. En consecuencia, si uno de los contratantes incumple el otro puede darlo por resuelto sin necesidad de que un tribunal así lo declare. *Flores v. Municipio de Caguas*, 114 D.P.R. 521 (1983); *Sucn. Escalera v. Barreto*, 81 D.P.R. 596 (1959); *Federal Land Bank v. Echeandía*, 48 D.P.R. 320 (1935). Este principio general en materia de contratos recíprocos, denominado en latín *exceptio non adimpleti contractus*, constituye una defensa oponible a la parte que habiendo incurrido en incumplimiento exige, no obstante, el cumplimiento del contrato.

 Ahora bien, no debe perderse de vista el hecho de que, independientemente de que exista la facultad resolutoria, el perjudicado en un contrato bilateral tiene la alternativa de exigir el cumplimiento específico del mismo o su resolución. En relación con *ambas* alternativas, el perjudicado tiene derecho a reclamar los daños y perjuicios resultantes del incumplimiento. Por supuesto, según nos indica Manresa, resumiendo la jurisprudencia española, es preciso *probar* tales daños:

> ... no va ineludiblemente ligada la indemnización de daños y perjuicios al incumplimiento contractual, en relación con lo estatuido en el artículo 1.124 [1077 nuestro], sino que es preciso demostrar, además, la existencia real de los que en su caso hubieren podido sufrir los que ejercitan la acción de cumplimiento del contrato. J.M. Manresa y Navarro, *Comentarios al Código Civil Español*, 6ta ed. rev., Madrid, Ed. Reus, 1967, T. VIII, Vol. 1, pág. 421.

 El concepto de obra, según nos ilustran Miguel A. Del Arco y Manuel Pons en su obra *Derecho de la Construcción*, 2da ed., Jaén, Ed. Hesperia, 1987, pág. 39, comprende todo resultado a producirse por el trabajo o por la actividad. El contratista se obliga no solamente a realizar la obra, *sino también a realizarla bien;* obligación que existirá aunque no haya pacto expreso a esos efectos. Véase Albaladejo, *Comentarios al Código Civil y compilaciones forales*, ante, págs. 231–234.

 Del Arco y Pons, ante, págs. 40–41, nos ilustran al respecto:

> El contratista viene obligado a ejecutar la obra conforme a lo convenido en el contrato, a las reglas del arte de la construcción y a los usos o reglas profesionales.
> *Mas, si lo ejecutado resulta de calidad inferior o presenta defectos, es indudable que no se ha obtenido el resultado previsto; y que, el contratista no ha cumplido su obligación.* (Énfasis suplido.)

■ Como sabemos, nuestro Código Civil contiene una disposición específica que le impone una responsabilidad especial a los profesionales de la construcción por los vicios o defectos de que adolezca la obra construida o supervisada por ellos. En especial, dispone el Art. 1483 del Código Civil, 31 L.P.R.A. sec. 4124:

> *Sec. 4124. Responsabilidad del contratista y del arquitecto de un edificio arruinado por vicios de construcción*
> El *contratista* de un edificio que se arruinase por vicios de la construcción, responde de los daños y perjuicios si la ruina tuviere lugar dentro de diez (10) años, contados desde que concluyó la construcción; igual responsabilidad, y por el mismo tiempo, tendrá el *arquitecto* que la dirigiere, si se debe la ruina a vicios del suelo o de la dirección.
> Si la causa fuere la falta del contratista a las condiciones del contrato, la acción del [sic] indemnización durará quince (15) años. (Énfasis suplido.)

■ El Art. 1483 del Código Civil, ante, ha sido objeto de bastante discusión por parte de este Foro. Hemos señalado, en síntesis, que la protección jurídica que el mismo entraña a favor de los adquirentes de viviendas tiene el propósito de indemnizar los daños y perjuicios por los defectos o vicios de la construcción al igual que las angustias mentales que éstos hayan causado. *Pereira v. I.B.E.C.*, 95 D.P.R. 28, 82 (1967). La responsabilidad decenal que establece puede imponerse contra un contratista, un arquitecto o aquellos profesionales de la construcción que hayan causado la ruina del edificio, ruina que puede ser parcial. *Géigel v. Mariani*, 85 D.P.R. 46 (1962). Estos vicios, manifestamos en *Pereira v. I.B.E.C.*, ante, deben ser aquellos que excedan de la medida de las imperfecciones que cabe esperar en una construcción. No debe olvidarse que, habiendo aceptado el dueño la obra construida, los vicios que "activan" el Art. 1483 del Código Civil, ante, *son los "ocultos"*. Véase *González v. Agostini*, 79 D.P.R. 510 (1956).

## II

 Mediante su primer señalamiento de error, Constructora cuestiona la condena que por la suma de cuarenta y un mil quinientos veinte dólares ($41,520) decretara el foro de instancia en la sentencia recurrida. Recordaremos que la mencionada suma de dinero, conforme los términos de la referida sentencia, es en resarcimiento de los alegados vicios de que adolece la construcción por ella realizada. *En síntesis, alega Constructora que dichos vicios eran unos "aparentes" por los cuales ella no viene civilmente obligada a responder en vista de que el dueño de la obra "aceptó" la misma.* En apoyo de su contención, Constructora cita nuestra decisión en *González v. Agostini*, ante. En el antes mencionado caso expresamos, en las págs. 519–521, lo siguiente:

> Ahora bien, el art. 1483 habla de *vicios de la construcción* sin distinguir entre los vicios ocultos y aquéllos que son apreciables a simple vista o por el examen que suele hacerse ordinariamente. ¿Cabe esa distinción a los fines de determinar cuáles están cubiertos por el plazo legal de garantía? Creemos que sí. La propia razón del precepto lo justifica. No abundan las opiniones de los comentaristas españoles sobre esta cuestión. Un gran número de ellos guarda silencio o no discute el problema. Aquellos que lo discuten, se deciden por la distinción.
>
> . . . . . . . .
>
> Los autores franceses, y la jurisprudencia de su país sostienen que para que el arquitecto o empresario sean responsables dentro del plazo de garantía fijado por la ley es condición que se trate de vicios ocultos. *A juicio de algunos de ellos, la existencia de vicios aparentes que el propietario no ha podido ignorar en el momento de la recepción de la obra no implica responsabilidad alguna para el arquitecto o empresario.* 'Hay que presumir que una obra recibida sin reparos no tenía vicios aparentes.' *Si los vicios fueran aparentes de modo que el que examina y recibe las obras pudo reconocerlos, no se está ya en el caso del artículo que fija el plazo de garantía sino que se vuelve a la regla común según la cual la recepción de la obra descarga al obrero de la responsabilidad.*
> La cuestión que discutimos tiene importancia en la decisión

de este caso porque como se recordará, cuando el demandante recibió el edificio ya conocía los vicios de construcción que motivan esta reclamación de daños y perjuicios. *Si la recepción se hubiera hecho a plena satisfacción o sin reservas, el contratista, conforme a la doctrina expuesta anteriormente, hubiera quedado libre de responsabilidad por los vicios manifiestos que eran conocidos por el propietario ya que dicha aceptación implicaba una renuncia a reclamar por tales vicios.* No así en cuanto a los vicios ocultos. Pero según hemos visto, el demandante protestó de los vicios ostensibles que conocía e hizo la recepción del edificio sujeto a esa reserva. Ante esta situación, ¿cuál era el plazo que tenía para establecer su reclamación por los daños sufridos a causa de los vicios de construcción aparentes y conocidos por él? A nuestro juicio, el de 30 días convenido por las partes. (Escolios omitidos y énfasis suplido y en el original.)

A esos efectos, *Constructora argumenta que "la aceptación" de la obra realizada por ella por parte del Dr. García* —"aceptación" que, conforme su argumento, la exonera totalmente de responsabilidad por cuanto se trataba de vicios aparentes— *se configuró de dos (2) formas. En primer lugar*, señala que luego de la paralización de la obra, ocurrida como consecuencia de las aparentes y obvias deficiencias de la misma, las partes acordaron continuar la obra bajo unas *totalmente nuevas y diferentes condiciones*, a saber: que Constructora corregiría *únicamente* aquellas deficiencias susceptibles de ser corregidas; que la obra continuaría bajo un *nuevo* plano (*as built*), con una *nueva* fecha de entrega o terminación de la obra, y habiéndose pactado un *nuevo* precio ajustado. En palabras sencillas, Constructora sostiene que en ese momento ocurrió una "novación" del contrato original otorgado entre las partes. En *segundo lugar*, sostiene que la "aceptación" por parte del Dr. García se configuró al éste pagar, previa inspección por los peritos designados por el propio Dr. García, las certificaciones parciales que le sometió Constructora; el monto de cuyos pagos excedieron del noventa por ciento (90%) del nuevo precio pactado.

## III

Conforme dispone el Art. 1157 del Código Civil, 31 L.P.R.A. sec. 3241, las obligaciones pueden modificarse: (1) variando su objeto o sus condiciones principales; (2) sustituyendo la persona del deudor, y (3) subrogando a un tercero en los derechos del acreedor. Por su parte, el Art. 1158 del citado Código Civil, 31 L.P.R.A. sec. 3242, establece que para "que una obligación quede extinguida por otra que la sustituya, es preciso que así se declare terminantemente, o que la antigua y la nueva sean de todo punto incompatibles".

Un análisis de nuestra jurisprudencia, interpretativa de las antes mencionadas disposiciones legales, demuestra que hemos establecido "como pauta interpretativa de este articulado que la novación nunca se presume sino que ha de ser acreditada sin género alguno de duda"; que la misma "es siempre una cuestión de intención y que ésta debe inferirse de las circunstancias que rodean cada caso en particular"; que la "doctrina puntualiza el elemento de la voluntad de las partes como determinante de la novación", y que por razón de que "la extinción de la obligación conlleva la extinción de las garantías y demás derechos accesorios", resulta "evidente que una consecuencia tan drástica como ésta sólo puede producirse cuando las partes han tenido clara conciencia de ella". *Warner Lambert Co. v. Tribunal Superior*, 101 D.P.R. 378, 389, 391–392 (1973). En relación con la "incompatibilidad" a la que se refiere la segunda alternativa provista por el citado Art. 1158 del Código Civil, hemos señalado que "es a la absoluta, a la excluyente de todo punto"; cuestión que es una de "interpretación que siempre suscita controversia". *G. & J., Inc. v. Doré Rice Mill, Inc.*, 108 D.P.R. 89, 91, 96 (1978).

En *Miranda Soto v. Mena Eró*, 109 D.P.R. 473,

479–480 (1980), citando con aprobación a distinguidos comentaristas del Derecho Civil,(⁴) señalamos que

> ... "la incompatibilidad existe cuando la obligación anterior y la posterior al acto novativo pertenecen a tipos distintos o se han transformado de naturaleza". Empero, apuntan que la jurisprudencia "afirma reiteradamente *que la incompatibilidad existe cuando hay alteraciones esenciales en la obligación, es decir, variación de las 'condiciones principales' de las que habla el Art. 1203 [1157 nuestro, 31 L.P.R.A. sec. 3241] como el objeto o el precio en el contrato*. No hay novación, en cambio, cuando subsistiendo la obligación primitiva se dan facilidades para su cumplimiento, *v.g.*, prórroga o plazos fraccionados. *No obstante, cuando el plazo constituye condición esencial del contrato, su alteración es causa de novación extintiva por incompatibilidad entre la nueva y la primitiva obligación*. En definitiva, el criterio jurisprudencial es el que juzga acerca de si han variado 'las condiciones principales', en suma, *se deja a la apreciación de cada caso si una variación afecta a una condición que ha de ser tenida por principal*". (Énfasis suplido y en el original.)

En *Marina Ind., Inc. v. Brown Boveri Corp.*, 114 D.P.R. 64, 73–74 (1983), rechazamos la posición a los efectos de que "puede efectuarse una novación extintiva cuando las partes *tan solo se limitan a reproducir la misma obligación con algún cambio insignificante*". (Énfasis suplido.) Por último, y en lo pertinente, en *Teachers Annuity v. Soc. de Gananciales*, 115 D.P.R. 277, 285–286 (1984), enfatizamos el hecho de que "la doctrina ha superado el rigor conceptualista que el Derecho romano impartió a la novación. Ayer la novación se concebía sólo como un medio de extinción de las obligaciones. Hoy, sin embargo, la admitimos con efectos más limitados, como es la simple modificación de la obligación".

A la luz de lo antes expresado, y conforme los hechos específicos del caso ante nuestra consideración, parece inescapable la conclusión a los efectos de que en el pre-

---

(⁴) L. Díez-Picazo y A. Gullón, *Sistema de Derecho Civil*, Madrid, Ed. Tecnos, 1976, Vol. II, pág. 195.

sente caso, luego que el Dr. García ordenara la paralización de la obra, ocurrió una *novación* de la obligación originalmente pactada por las partes. La prueba presentada ante el foro de instancia demuestra que Constructora, durante los primeros meses, no construyó la obra conforme lo pactado, esto es, conforme a las especificaciones contenidas en los planos que a esos efectos se le sometió. Ante dicho incumplimiento, el Dr. García pudo haber optado por las alternativas que brinda el Código Civil de Puerto Rico; esto es, pudo exigir el cumplimiento específico del contrato o resolver el mismo con la consabida reclamación por los daños y perjuicios que había sufrido. El Dr. García, sin embargo, no optó por las anteriormente mencionadas alternativas. Como hemos visto, éste decidió, *y expresamente pactó*, continuar adelante con un *nuevo* plano, conforme a lo construido (*as built*); con una *nueva* fecha de entrega de la obra; acordándose un *nuevo* precio, y con unas *nuevas cláusulas* —impositiva de bonos o multas— relativas a la fecha de terminación de la obra. "...[D]efinitivamente estamos ante un nuevo acuerdo de voluntades." *Atocha Thom McAn, Inc. v. Registrador*, 123 D.P.R. 571, 582 (1989).

No tenemos duda, repetimos, de que hubo una *novación extintiva* de la obligación originalmente pactada; ello en vista del hecho incuestionable de que hubo una *variación sustancial* de las *condiciones principales* que originalmente habían pactado las partes. *Miranda Soto v. Mena Eró*, ante. *La novación efectuada, no hay duda, relevó a Constructora de cualquier responsabilidad relativa a las deficiencias o vicios aparentes de los que adolecía la obra por ella construida hasta ese momento.*

## IV

En relación con los vicios o defectos en que alegada y supuestamente incurrió en la "segunda etapa" de la cons-

trucción, sostiene Constructora que tampoco debe responder civilmente por ellos. Constructora basa su contención en que: (1) los alegados defectos son de naturaleza "aparente"; (2) el Dr. García "aceptó", en etapas, lo construido por ella al pagarle las certificaciones parciales que Constructora le sometiera, y (3) siendo ello así, ella no responde bajo lo resuelto por este Tribunal en *González v. Agostini*, ante.

 A los fines de resolver el referido planteamiento resulta necesario examinar, aun cuando brevemente, el efecto o consecuencia que, respecto a la posible responsabilidad del contratista por defectos de construcción, tiene el hecho de que el dueño de la obra haya pagado las certificaciones parciales que durante la duración de la construcción le haya sometido el mencionado contratista.

 Nos ilustran Del Arco y Pons[5] a los efectos de que, de ordinario, "estos pagos parciales, 'a cuenta' o 'anticipos', que sólo serán debidos si se hubieren pactado, *no hacen presumir la recepción de la obra ni, por tanto, que el constructor haya cumplido fielmente sus obligaciones hasta el momento*". (Énfasis suplido.) Ello así por cuanto, conforme los citados comentaristas, las

> ... certificaciones parciales tienen el carácter de documentos y pagos provisionales en buena cuenta; sujetos, por tanto, a las rectificaciones y variaciones que produzca la medición final, que servirá de base para practicar a su vez la liquidación final. Por ello, los pagos parciales, hechos por el dueño de la obra no tienen carácter definitivo, sino sólo a cuenta de la liquidación final.
>
> *De igual modo, dichas certificaciones, no suponen tampoco la aprobación ni recepción de las obras que comprendan; de acuerdo con el hecho de que, el contrato no se considera cumplido sino con la ejecución total y, por tanto, el empresario no*

---

(5) M. A. Del Arco y M. Pons, *Derecho de la Construcción*, 2da ed., Jaén, Ed. Hesperia, 1980, pág. 96 (citando con aprobación a López Mora y de la Cámara Mingo, *Tratado práctico del Derecho referente a la construcción y a la arquitectura*, Madrid, 1964, T. IV, págs. 616 y 617).

*tiene derecho al pago sino hasta el momento de la recepción definitiva.* (Énfasis suplido.) Del Arco y Pons, ante, pág. 84.

¿Debe regirse el presente caso por la antes expuesta norma general? Creemos que no; veamos por qué en este caso en particular debemos apartarnos de la norma general antes expresada. En primer lugar, ambas partes están contestes en que los defectos en que alegadamente incurrió Constructora en esta *segunda* etapa de la construcción realizada son, al igual que los primeros vicios causantes de la paralización de la obra, de naturaleza *aparente*, esto es, que podían ser apreciados a la simple vista.

En segundo lugar, procede que se enfatice el hecho de que, conforme la prueba que desfilara ante el foro de instancia, las certificaciones parciales que le sometió Constructora al Dr. García fueron pagadas únicamente después que un perito, designado por este último, había inspeccionado el trabajo realizado por Constructora referente a la certificación sometida y éste daba su consentimiento, de manera expresa, a que la misma fuera pagada por el Dr. García. El perito ingeniero encargado de esta labor, según ello surge de la exposición narrativa de la prueba, lo fue el Ing. Héctor R. Rosario. Surge de la pág. 41 de la E.N.P., en lo pertinente, lo siguiente:

> Al preguntarle qué ocurría cuando se le entregaba una certificación por el Sr. Bauzá (representante de la Constructora en la obra), o sea, qué implicaba eso en relación con la obra y su aprobación. Contestó que él la recibía *y cotejaba que lo certificado estuviese hecho*, o sea, que cuando él aprobaba una certificación eso quería decir que eso estaba hecho *y que si no hubiese estado bien hecho él se lo hubiese señalado en el momento para que se corrigiera. Que los defectos que él vió al momento ordenó que se corrigieran y certificó como aprobado lo que estaba hecho ....* (Énfasis suplido.)

Siendo ello así, no hay duda de que hubo *aceptación* por parte del Dr. García del trabajo realizado por Constructora *en cuanto a cada una de las etapas certifica-*

*das;* aceptación que debe incluir los *vicios aparentes* de que pudiera adolecer el trabajo realizado. Estamos conscientes del hecho de que en el citado caso de *González v. Agostini,* ante, se trataba de la aceptación y pago por el dueño, al final de la construcción acordada, de la obra completa, mientras que en el presente caso la aceptación y pago se dio en etapas. Somos del criterio, sin embargo, que bajo los hechos específicos del presente caso —en que el dueño acepta y paga las certificaciones parciales que le somete el contratista únicamente después de que su propio perito examina lo construido y autoriza el pago— no hay razón alguna para no aplicar la norma jurisprudencial establecida en *González v. Agostini,* ante. Esto es, resolvemos que Constructora quedó libre de responsabilidad por los *vicios manifiestos* de que pudiera haber adolecido lo construido al momento en que el Dr. Bauzá, a recomendación de su perito, aceptó y pagó cada una de las certificaciones parciales que le fueron sometidas por la primera. Resulta improcedente, en consecuencia, la condena por la suma de cuarenta y un mil quinientos veinte dólares ($41,520) que el foro de instancia le impusiera a la recurrente en resarcimiento de los alegados vicios de que adolece la construcción realizada.

V

Alega, adicionalmente, la corporación recurrente que erró el foro de instancia al imponerle unas multas a ésta por alegadamente no haber "sustancialmente" terminado la obra para la nueva fecha pactada por las partes, esto es, para el 3 de marzo de 1985. La corporación recurrente alega que la obra a construirse por ella estuvo "sustancialmente" terminada para el 19 de febrero de 1985 por razón de que para esa fecha ella había certificado, y el dueño pagado, en exceso del noventa por ciento (90%) de la obra a ser realizada; esto es, había recibido pagos de parte del Dr.

García por la suma de ciento cincuenta y dos mil setecientos treinta y seis dólares con dos centavos ($152,736.02) del nuevo precio total pactado de ciento sesenta y dos mil doscientos dólares ($166,200). Le asiste la razón.

Conforme surge de la exposición narrativa de la prueba, los peritos de *ambas* partes coinciden en que es correcta la definición que del concepto de "entrega sustancial" hace el American Institute of Architects, a saber:

> "The date of substantial completion of the work or designated portion thereof is the date certified by the Architect [léase supervisor] *when construction is sufficiently complete*, in accordance with the contract documents, so the *owner can occupy or utilize the work or designated portion thereof for the use for which it was intended* [despite defects to be corrected or minor incomplete aspects of the work]." (Énfasis suplido.) E.N.P., pág. 7.

 No tenemos duda alguna sobre el hecho de que una obra que ha sido certificada, y pagada por el dueño luego de la inspección por un perito, en exceso de un noventa por ciento (90%) del monto total de la obra a ser realizada es una que, para todos los efectos prácticos, está "sustancialmente terminada" y podía ser ocupada por el Dr. García. Esto es, el monto de los pagos efectuados por el dueño de la obra al contratista, *vis-à-vis* el costo total de la obra, es uno de los elementos principales a considerar en la decisión de si la obra está "sustancialmente terminada". Erró, en consecuencia, el foro de instancia al condenar a la corporación recurrente al pago de la suma de siete mil veintisiete dólares con veinte centavos ($7,027.20) por concepto de multas, por alegadamente no haber terminado la obra en tiempo.

Por los fundamentos antes expresados, *se dictará sentencia revocatoria en el presente caso.*

La Juez Asociada Señora Naveira de Rodón y el Juez Asociado Señor Alonso Alonso no intervinieron.