S.M.C. CONSTRUCTION INC. y MÉNDEZ DEVELOPMENT GROUP, S.E., demandantes y peticionarios, *v.* MASTER CONCRETE CORPORATION, EMPRESAS MASTER y las COMPAÑÍAS DE SEGUROS X, Y, Z, demandados y recurridos.

*Número:* CC-96-59 *Resuelto:* 21 de mayo de 1997

*José A. Martínez*, abogado de la parte peticionaria; *Jorge A. Pérez* y *José W. Vázquez Matos*, abogados de la parte recurrida.

EL JUEZ ASOCIADO SEÑOR HERNÁNDEZ DENTON emitió la opinión del Tribunal.

Nos corresponde determinar si el contrato en virtud del cual un contratista independiente adquiere de una empresa el hormigón que usa en sus construcciones, constituye un contrato de compraventa mercantil o si constituye un contrato de ejecución de obra. También debemos determinar cuál es el plazo que tiene a su disposición un contratista para reclamar una indemnización por alegados defectos en la calidad del hormigón adquirido. Resolvemos que el contrato en cuestión constituye un contrato de compra-

venta mercantil y que la acción de reclamación por alegados defectos en el hormigón adquirido en el caso de autos constituye una acción por incumplimiento contractual por entrega de un bien de distinta calidad a la requerida para su destino, con un término prescriptivo de quince (15) años.

I

S.M.C. Construction, Inc. y Méndez Development Group, S.E. (en adelante S.M.C.), entidades domésticas vinculadas al negocio de la construcción y el desarrollo de proyectos de urbanizaciones, tuvieron a su cargo la construcción y posterior venta de ciento noventa y siete (197) unidades de vivienda ubicadas en lo que vino a conocerse como la Urbanización La Inmaculada en el Municipio de Vega Alta.[1] Con este fin, S.M.C. contrató a Master Concrete, Corp. (en adelante Master Concrete) para que le proveyera el hormigón premezclado que utilizaría en la construcción. Master Concrete suplió el hormigón premezclado durante los meses comprendidos entre octubre de 1988 y octubre de 1990. Como parte de esa gestión, tuvo a su cargo la manufactura, procesamiento, transportación y entrega del hormigón en el área en donde estaba siendo construida la urbanización La Inmaculada.

La última entrega de hormigón ocurrió el 30 de octubre de 1990. Luego de ello, se comenzaron a observar problemas de humedad y filtración en los techos de algunas de las unidades de vivienda. Ante esta situación, S.M.C. se comunicó en varias ocasiones con Master Concrete para expresarle el problema por el que estaba atravesando, así como su intención de no continuar usando el hormigón pre-

---

[1] S.M.C. Construction, Inc. y Méndez Development Group, S.E. (en adelante S.M.C.) tuvieron a su cargo. la construcción de las unidades de vivienda. Méndez Development Group, por su parte, estuvo encargada del desarrollo y la venta de las unidades construidas.

mezclado que producía. La primera comunicación fue el 7 de diciembre de 1990, a través de una carta certificada que S.M.C. envió al Sr. Elías Maldonado, presidente de Master Concrete. Una segunda carta fue remitida a Master Concrete el 4 de enero de 1991. Mientras tanto, S.M.C. costeó las reparaciones de los techos de las viviendas afectadas.

Ante la negativa de Master Concrete de responsabilizarse por las filtraciones experimentadas en los techos de las viviendas, S.M.C. tomó muestras del concreto de los techos afectados y las envió a varios laboratorios en Estados Unidos para que fueran analizadas. Dos (2) estudios independientes revelaron que el hormigón tenía una alta permeabilidad y que tenía una proporción de agua mayor a la recomendada.[2]

Ante este cuadro, el 11 de febrero de 1992 S.M.C. instó una reclamación judicial en el entonces Tribunal Superior, Sala de Bayamón. En ella alegó que el hormigón premezclado suplido por Master Concrete no cumplía con los estándares requeridos para el tipo de construcción en el que sería usado y que la mezcla no satisfizo lo pactado entre las partes. En vista de ello, solicitó una indemnización por los gastos en los que había incurrido al reparar los techos de las viviendas afectadas.[3]

Luego de varios incidentes procesales, Master Concrete solicitó al tribunal que emitiera sentencia de forma sumaria. En su moción, además, instó una reconvención contra S.M.C. en la que reclamó el pago de veinte mil doscientos ochenta dólares con sesenta centavos ($20,280.60)

---

[2] El primer estudio lo realizó la compañía Testing Engineers & Consultant, Inc. y fue finalizado en agosto de 1991. El segundo estudio fue preparado por la Compañía Construction Technology Laboratories, Inc. y tiene fecha de octubre de 1991.

[3] Al respecto, reclamó ciento treinta y cinco mil dólares ($135,000) en concepto de las reparaciones efectuadas en las viviendas, así como cualquier otra suma que en el futuro debiera satisfacer como resultado de la utilización del alegado hormigón defectuoso; doscientos mil dólares ($200,000) como indemnización por los daños que la conducta de la demandada le ha ocasionado; costas y honorarios de abogado.

que alegó ésta le adeudaba en concepto del hormigón premezclado que había provisto.

El tribunal de instancia acogió su solicitud y procedió a desestimar sumariamente la demanda bajo el fundamento de que la acción de S.M.C. constituía una reclamación por vicios ocultos derivada de una compraventa mercantil. Estimó que S.M.C. debió denunciar el vicio oculto al vendedor dentro del término de caducidad de treinta (30) días, previo a la reclamación judicial correspondiente, que comienza a computarse a partir de la entrega del bien adquirido. Art. 260 del Código de Comercio, 10 L.P.R.A. sec. 1718. Por tal razón, el foro de instancia concluyó que S.M.C. debió hacer la denuncia o notificación del vicio oculto no más tarde de 29 de noviembre de 1990, fecha en que se cumplían los treinta (30) días desde la última entrega del hormigón premezclado, y que por haber instado la demanda en febrero de 1992, ésta debía ser desestimada.

En cuanto a la reconvención, el tribunal resolvió que a la luz de una previa admisión de S.M.C. de que las facturas que dieron base a la reconvención no habían sido satisfechas, procedía declararla con lugar.

Inconforme con esa decisión, S.M.C. acudió mediante un recurso de apelación ante el Tribunal de Circuito de Apelaciones. Después de un extenso análisis de las distintas figuras jurídicas aplicables, dicho foro confirmó la sentencia en todas sus partes. A su juicio, se encontraba ante una compraventa mercantil y ante una reclamación por vicios ocultos, en cuyo caso S.M.C. debió denunciar el vicio dentro de los treinta (30) días siguientes a la última entrega del hormigón.([4]) A pesar de su decisión, el foro recu-

---

([4]) El Tribunal de Circuito de Apelaciones, además, examinó si a S.M.C. le asistía algún otro derecho frente a la demandada Master Concrete, Corp. (en adelante Master Concrete). Al respecto, evaluó la posibilidad de que la demandante tuviera un derecho de subrogación por haber costeado las reparaciones. El foro apelativo, sin embargo, estimó que tal derecho no le asistía.

rrido consignó en su sentencia su insatisfacción con el resultado. Al respecto, expresa su sentencia:

Ciertamente los efectos de asumir esta posición en casos concretos como el presente pueden ser trascendentales. Al aplicar a este caso dicha doctrina, nos encontramos con el hecho de que el término para denunciar transcurrió aún cuando el afectado desconocía del vicio. No empece nuestro convencimiento de que este no es el resultado más justo, es nuestra obligación seguir la norma pautada por nuestro Tribunal Supremo. A ellos es a quienes corresponde entonces, variar la doctrina para ajustarla a las realidades como las acaecidas en este caso. (Sentencia del Tribunal de Circuito de Apelaciones de 30 de enero de 1996, a la pág. 17.) Apéndice, pág. 340.

Inconforme con la determinación del Tribunal de Circuito de Apelaciones, S.M.C. acudió ante esta Curia mediante un recurso de *certiorari* en el que señala la comisión de cinco (5) errores por parte del foro apelativo. Por el resultado al cual llegamos sólo es necesario considerar los primeros dos (2) errores señalados por S.M.C. Estos son: (1) si erró el foro recurrido al determinar que Master Concrete era un suplidor de productos y que, por lo tanto, no le aplicaba el plazo decenal prescrito por el Código Civil para que un contratista independiente responda por las ruinas y los vicios ocultos de la obra a él encomendada, y (2) si erró al determinar que era aplicable el plazo de caducidad de treinta (30) días establecido por el Código de Comercio para instar una acción de vicios ocultos derivada de una compraventa mercantil.[5]

---

[5] Los restantes errores señalados por S.M.C. son:

"3. Erró el Honorable Tribunal de Apelaciones al confirmar que la parte demandante no era acreedora a la cuantía reclamada bajo el derecho de subrogación, que nacía al reparar los techos de hormigón defectuosos a beneficio de los ocupantes para mitigar daños.

"4. Erró el Honorable Tribunal de Apelaciones al confirmar que no es de aplicación la doctrina que establece que la ley del caso no le permitía a la parte demandada replantear un mismo motivo para desestimar, cuando el asunto de la prescripción había sido ya previamente objeto de señalamiento específico por la parte demandada y adjudicado en esa etapa por el Tribunal de Instancia.

"5. Erró el Honorable Tribunal de Apelaciones al confirmar que no existe con-

Por estar estrechamente vinculados, consideraremos ambos errores de forma conjunta.

## II

La correcta solución de la controversia de autos requiere examinar inicialmente la naturaleza de la relación jurídica existente entre S.M.C. y Master Concrete para determinar si estamos ante una compraventa mercantil, como sostuvo el Tribunal de Circuito de Apelaciones, o si nos encontramos ante un contrato de ejecución de obra según afirma S.M.C. Examinemos los elementos de cada una de estas figuras.

 Como es sabido, el Código de Comercio no define el contrato de compraventa mercantil; tan sólo enumera unos supuestos bajo los cuales una compraventa debe reputarse mercantil. Es el Código Civil el cuerpo legal que define la compraventa como aquel contrato mediante el cual "uno de los contratantes se obliga [a] entregar una cosa determinada y el otro a pagar por ella un precio cierto, en dinero o signo que lo represente". Art. 1334 del Código Civil, 31 L.P.R.A. sec. 3741. Dicho contrato de compraventa será mercantil cuando se efectúe para revender los bienes adquiridos, "bien en la misma forma que se compraron, o bien en otra diferente, con ánimo de lucrarse en la reventa". Art. 243 del Código de Comercio, 10 L.P.R.A. sec. 1701. De este modo, en la compraventa mercantil el comprador es guiado "por el doble propósito de revender ulteriormente las cosas compradas y de obtener un lucro". *Reece Corp. v. Ariela, Inc.*, 122 D.P.R. 270, 276–277 (1988). Véanse: *Ramallo Brothers Printing, Inc. v. Ramis*, 133

---

troversia de clase alguna en el pleito y que por consiguiente se dicte sentencia de forma sumaria." Petición de *certiorari*, págs. 6–7.

Debemos destacar que en su Petición de *Certiorari*, S.M.C. no cuestiona la procedencia de la reconvención según lo resolvió el Tribunal de Circuito de Apelaciones. Este aspecto de la sentencia del foro recurrido, en consecuencia, no es objeto de revisión, por lo que éste queda inalterado.

D.P.R. 436 (1993); *Julsrud v. Peche de P.R., Inc.*, 115 D.P.R. 18, 21 (1983); *Buena Vista Dairy, Inc. v. Aponte*, 108 D.P.R. 657 (1979). Véase, además, C. Díaz Olivo, *La compraventa mercantil: ¿una especie en peligro de extinción?*, 64 Rev. Jur. U.P.R. 51, 60 (1995).

■ Un contrato de ejecución de obra, por su parte, llamado también como de arrendamiento de obras,(⁶) es aquel mediante el cual

> ... una parte, generalmente denominada "contratista" se compromete a realizar y entregar una obra o construcción según la misma fue contratada, mientras que la otra parte, el dueño, se obliga a pagar el precio convenido en la forma y el tiempo así pactado. *Constructora Bauzá, Inc. v. García López*, 129 D.P.R. 579 (1991).

Puig Brutau lo define como "el contrato por el que una de las partes, llamada contratista, empresario o artífice, se obliga frente a la otra, llamada principal o comitente, a la producción de un determinado resultado con su actividad independiente, a cambio de un precio cierto". J. Puig Brutau, *Fundamentos de Derecho Civil*, Barcelona, Ed. Bosch, 1982, T. II, Vol. 2, pág. 438. Véanse, además: M. Albaladejo, *Derecho Civil*, 4ta ed., Barcelona, Ed. Bosch, 1977, Vol. II, pág. 309; J. Cadarso Palau, *La responsabilidad decenal de arquitectos y constructores*, 1976; J. Herrera Catena, *Responsabilidades en la Construcción*, Granada, Ed. Gráficas del Sur, 1985.

La doctrina reconoce variados elementos que hacen del contrato de ejecución de obra un contrato cualitativamente distinto de un negocio de compraventa. Albaladejo señala que en el contrato de ejecución de obra "se promete un resultado ... con independencia del trabajo ... necesario para realizarlo ...". Albaladejo, *op. cit.*, pág. 309. Puig Brutau, por su parte, enumera varias circunstancias que de-

---

(⁶) Un sector mayoritario de la doctrina considera como anacrónica esta denominación. Véase J. Puig Brutau, *Fundamentos de Derecho Civil*, Barcelona, Ed. Bosch, 1982, T. II, Vol. 2, pág. 439.

ben considerarse para que este contrato pueda ser calificado como tal: (1) que el contratista realiza el trabajo de manera independiente en el ejercicio de una profesión autónoma; (2) que es remunerado mediante un precio alzado en consideración al resultado que ha de alcanzar; (3) que posee habilidad y conocimientos técnicos especializados que no posee el comitente y lo capacitan para la realización de la obra; (4) que trabaja generalmente con herramientas y equipo propio, y (5) que no es necesario que realice directamente la obra, siendo suficiente que la dirija. Puig Brutau, *op. cit.*, págs. 439–440.

■ Mientras que a través del contrato de compraventa se adquiere la propiedad sobre un bien a cambio de un precio cierto, mediante un contrato de ejecución de obra "el deudor se compromete a efectuar una actividad dirigida al logro de resultado específico, en contraprestación a un precio determinado". E. Vázquez Bote, *Tratado teórico, práctico y crítico de derecho privado puertorriqueño*, New Hampshire, Equity Publishing Corp., 1992, T. IX, pág. 362.

■ Sin embargo, las diferencias entre uno u otro negocio jurídico no siempre están claramente delineadas. La doctrina reconoce instancias en que la determinación correcta del negocio jurídico realizado resulta particularmente difícil. Esta es la situación que ocurre cuando la obra encomendada es realizada con materiales suministrados por el comitente según lo permite el Código Civil.[7] Véase Puig Brutau, *op. cit.*, pág. 441.

Vicent Chuliá destaca esta dificultad y recomienda que para resolverla es preciso analizar "la importancia que ambas partes hayan dado al trabajo, al "hacer" de quien ha de entregar o "dar" la cosa ...". F. Vicent Chuliá, *Compendio*

---

[7] El Código Civil señala que el contrato de ejecución de obra puede efectuarse "conviniendo en que el que la ejecute ponga solamente su trabajo o su industria, o que también suministre el material". Art. 1480 del Código Civil, 31 L.P.R.A. sec. 4121.

*Crítico de Derecho Mercantil,* 2da ed., Barcelona, Ed. Bosch, 1986, T. II, pág. 306.

Díez-Picazo y Gullón, por su parte, advierten igual problema y recomiendan que la justa solución de la controversia requiere indagar la voluntad última de los contratantes. Al respecto afirman:

> Si han dado especial importancia al proceso productivo de la cosa, al trabajo a realizar, sobre la materia objeto de aquel proceso, no hay duda de que será la de contrato de obra la calificación más adecuada. Cuando se busca la capacidad o habilidad de un artífice sería absurdo pretender que el comitente se ha dirigido a él con el fin de adquirir unos materiales simplemente. L. Díez-Picazo y A. Gullón, *Sistema de Derecho Civil,* 6ta ed., Madrid, Ed. Tecnos, 1989, Vol. II, pág. 434.

En virtud de lo anterior, añaden:

> ... en el contrato celebrado para la elaboración o construcción de una cosa fungible pierde el proceso productivo importancia frente a la obligación de entrega, a la prestación de dar, como sucede cuando se trata de cosas fungibles producidas de forma periódica y profesionalmente por quien las construye o elabora .... En cambio, si se encarga la elaboración o construcción de una cosa específica no fungible ... la prestación de hacer para conseguir un resultado es más relevante que la prestación de dar, específica de la compraventa. Díez-Picazo y Gullón, *op. cit.,* pág. 434.

A la luz de lo anterior, la resolución de la controversia de autos requiere dirigir nuestra atención hacia el objeto adquirido y hacia el énfasis dado por las partes, o bien a la prestación de *hacer* el bien en cuestión, o bien a la obligación de entregarlo o a la prestación de *dar.*

## III

S.M.C. argumenta que realizó un contrato con Master Concrete para que esta "manufacturara, procesara, transportara, vaciara y entregara, un hormigón premezclado de

acuerdo a un diseño pactado entre las partes ...". Petición de *certiorari*, pág. 9. Añade que

> [U]na hormigonera no ocupa el mismo lugar que un ferretero. Vende un producto esencial a la obra, manufacturando ella una porción fundamental de ésta. Sus propios técnicos desarrollan y establecen el diseño de la mezcla y poseen todo el control sobre su calidad, dosificación, manejo y entrega. Petición de *certiorari*, pág. 10.

Por lo anterior, concluye que el contrato mediante el cual un contratista adquiere el hormigón que usa en sus construcciones constituye un contrato de ejecución de obra. No nos persuade.

Un análisis de los términos del contrato suscrito entre las partes revela que en éste Master Concrete, denominada El Vendedor (*The Seller*), se obligó a proveerle (*to provide*) a S.M.C., denominada El Comprador (*The Buyer*), el hormigón que usaría en su proyecto de construcción. Apéndice, pág. 163. A lo largo del contrato, se detallan los costos y se incluyen varias disposiciones relacionadas a la responsabilidad de las partes en caso de incidentes contingentes que pudieran afectar el proceso de suplido del hormigón. De igual forma, Master Concrete se comprometió a "suplir" (*All concrete to be supplied by THE SELLER* ) un hormigón que cumpliera con los requerimientos y especificaciones de la *American Society of Testing Materials*; y se comprometió a llevar el hormigón al lugar indicado por El Comprador.

El contrato no incluye ningún tipo de condición especial para el proyecto ni ningún tipo de proporción específica para los materiales que serían usados en la elaboración del hormigón que requiriera que Master Concrete se desviara de la práctica que normalmente sigue para preparar el hormigón que vende al público. Más aún, el contrato específicamente expresa: " EL VENDEDOR no se convierte por este acto en un subcontratista dentro del significado de cualesquiera leyes, reglamentos, acuerdos o convenios sin-

dicales, sino que continúa siendo un vendedor de materiales".[8] (Traducción nuestra.) Apéndice, pág. 200.

De las alegaciones de las partes tampoco surge que al dar cumplimiento a lo pactado las partes se desviaran objetivamente de lo convenido en el contrato. Master Concrete elaboró un hormigón que posteriormente transportó hasta el proyecto La Inmaculada. Allí lo puso a disposición de S.M.C., quien lo utilizó para la construcción de los techos de las viviendas. Este proceso no reúne las características que convertirían el negocio jurídico realizado entre las partes en un contrato de ejecución de obra.

No estamos ante un contrato por el cual una parte se ha obligado con otra a la creación o producción de un determinado resultado en virtud de que realiza una actividad independiente. Por el contrario, los autos revelan que Master Concrete *suplió* el hormigón premezclado de acuerdo con las especificaciones que de ordinario siguen en el ejercicio de su actividad comercial. Se trata de un producto genérico que de ordinario produce en masa para la venta al público. A la luz de lo anterior, estimamos que en el contrato de autos, el énfasis de las prestaciones estaba en el "dar" y no en el "hacer". Por ello, no podemos sino concluir que el negocio jurídico existente entre las partes era el de una compraventa y que Master Concrete era una suplidora de materiales y no un subcontratista independiente.

Por otro lado, surge claramente de las alegaciones y de los documentos que obran en los autos que la compra del hormigón fue efectuada con el objetivo de usarlo en los techos de las unidades de vivienda que eventualmente fueron vendidas al público y que en ese proceso la intención de S.M.C. era lucrarse en la reventa. De este modo, concurren plenamente los elementos característicos de la compra-

---

[8] El texto original dispone: "THE SELLER does not hereby become a subcontract within the meaning of any laws, regulations, agreement or union contract, but remains only a seller of materials." Apéndice, pág. 200.

venta mercantil. Art. 243 del Código de Comercio, *supra*; *Reece Corp. v. Ariela, Inc.*, supra.

Por ende, coincidimos con el Tribunal de Circuito de Apelaciones en su conclusión de que el negocio jurídico formalizado entre S.M.C. y Master Concrete constituyó un contrato de compraventa mercantil, por lo que son aplicables, en primer término, las disposiciones del Código de Comercio relativas a esta figura jurídica. Establecido que nos encontramos ante una compraventa de naturaleza mercantil, procede determinar la naturaleza de la acción instada por S.M.C. y el plazo que tenía para hacerlo.

## IV

El Código de Comercio establece varias acciones que permiten al comprador obtener una indemnización por los acontecimientos o riesgos que menoscaban el disfrute del bien adquirido. Estas acciones de ordinario poseen un término prescriptivo dentro del cual deben ser instadas. Sin embargo, el Código de Comercio no tiene una reglamentación sistemática y completa de todos los términos prescriptivos. *Ramallo Brothers Printing, Inc. v. Ramis*, supra. Sólo regula algunos casos, y aquellas acciones que carecen de término específico quedan reguladas por el Código Civil.

En el caso de autos, el Tribunal de Circuito de Apelaciones estimó que la acción instada por S.M.C. constituía una acción por vicios ocultos derivada de una compraventa mercantil. Por ello, en virtud del Art. 260 del Código de Comercio, *supra*, estimó que la acción había caducado, ya que no medió reclamación alguna por parte de S.M.C. dentro del término de treinta (30) días luego de la última entrega del hormigón.[9]

Aplicado este artículo a los hechos concretos del

---

[9] El artículo en el que el foro recurrido basó su determinación dispone:

caso de autos, no hay duda de que la acción de reclamación por vicios ocultos efectivamente ha caducado. La última entrega del hormigón ocurrió el 30 de octubre de 1990. Véase Apéndice, pág. 126. Vista la reclamación como una acción por vicios ocultos, S.M.C. tenía hasta el 29 de noviembre para hacer la denuncia a Master Concrete. En cambio, la primera denuncia de la recurrente ocurrió el 7 de diciembre de 1990, transcurridos más de treinta (30) días desde la entrega. Aun asumiendo que S.M.C. hubiera efectuado la denuncia en tiempo, su reclamación judicial fue instada transcurrido más de un (1) año desde la entrega y no dentro del término de seis (6) meses que prescribe nuestro ordenamiento jurídico. *Julsrud v. Peche de P.R., Inc.*, supra. Como es sabido, al amparo de este tipo de reclamaciones, "[t]ranscurrido ese plazo perderá el comprador toda acción y derecho a repetir contra el vendedor". R. Uría, *Derecho Mercantil*, Madrid, Imp. Silverio Aguirre Torre, 1960, pág. 404.

La aplicación de las normas relativas a vicios ocultos en el caso de compraventas mercantiles, como en el caso de autos, puede llevar a resultados absurdos cuando, por la naturaleza del bien comprado, sus vicios internos de ordinario no pueden ser percibidos sino hasta mucho tiempo después de la entrega. Esta situación tiene el efecto práctico de privar al comprador de una acción que nuestro ordenamiento civilista le reconoce a la luz de los intereses involucrados en el tráfico jurídico. Sin embargo, ¿está S.M.C. desprovista de todo remedio judicial para resarcirse por los daños y perjuicios que el alegado hormigón defectuoso le ha ocasionado? ¿Tiene a su disposición algún remedio legal mediante el cual pueda recobrar lo invertido por ella en la reparación de los techos de las viviendas

---

"El comprador que no haya hecho reclamación alguna fundada en los vicios internos de la cosa vendida, dentro de los treinta días siguientes a su entrega, perderá toda acción y derecho a repetir por esta causa contra el vendedor." Art. 260 del Código de Comercio, 10 L.P.R.A. sec. 1718.

afectadas, si en efecto la causa de las filtraciones es atribuible a Master Concrete? Evaluemos estas interrogantes.

La doctrina civilista reconoce que la evaluación de la naturaleza de los vicios por los cuales se reclama puede dar lugar a múltiples disputas, ya que los vicios pueden deberse a *vicios de calidad constitutivos de prestación diversa* o *aliud pro alio*; o a *vicios de calidad constitutivos de una prestación defectuosa*. E. Langle y Rubio, *El Contrato de Compraventa Mercantil*, Barcelona, Ed. Bosch, 1958, pág. 73 y ss. Sobre el primer supuesto, la doctrina reconoce que no se está ante una reclamación por vicios ocultos en el bien adquirido, ya que no ha habido propiamente una entrega por parte del vendedor. En tales casos se afirma que el vendedor "ha realizado una prestación diversa, no ha cumplido lo pactado", íd., pág. 74, por lo que la doctrina señala que las normas aplicables son las normas generales de incumplimiento de las obligaciones reguladas por el Código Civil —Arts. 1054 y 1077 del Código Civil de Puerto Rico, 31 L.P.R.A. secs. 3018 y 3052—([10]) en ausencia de disposiciones específicas en el Código de Comercio. Véanse:

---

([10]) Disponen los referidos artículos:

Art. 1054:

"Quedan sujetos a la indemnización de los daños y perjuicios causados, los que en el cumplimiento de sus obligaciones incurrieren en dolo, negligencia o morosidad, y los que de cualquier modo contravinieren al tenor de aquéllas." 31 L.P.R.A. sec. 3018.Véase *R.R. Pesquera & Co. v. Mari Hermanos*, 23 D.P.R. 637 (1916), en donde señalamos que este artículo aplica tanto a los negocios civiles como a los mercantiles. Véase, más recientemente, a *Lugo Falcón v. E.M. Amy & Sons, Inc.*, 87 D.P.R. 556 (1963).

Art. 1077:

"La facultad de resolver las obligaciones se entiende implícitamente en las recíprocas, para el caso de que uno de los obligados no cumpliere lo que le incumbe.

"El perjudicado podrá escoger entre exigir el cumplimiento o la resolución de la obligación, con el resarcimiento de daños y abono de intereses en ambos casos. También podrá pedir la resolución, aun después de haber optado por el cumplimiento, cuando éste resultare imposible.

"El Tribunal decretará la resolución que se reclame, a no haber causas justificadas que le autoricen para señalar plazo.

"Esto se entiende sin perjuicio de los derechos de terceros adquirentes, con arreglo a las secs. 3496 y 3499 de este título y las disposiciones de la Ley Hipotecaria y del Registro de la Propiedad, secs. 2001 *et seq.* del Título 30." 31 L.P.R.A. sec. 3052.

Art. 2 del Código de Comercio, 10 L.P.R.A. sec. 1002; Art. 12 del Código Civil, 31 L.P.R.A. sec. 12.

Al recurrir a las normas generales sobre incumplimiento de las obligaciones, el acreedor puede optar entre exigir el cumplimiento de la obligación o su resolución, y en ambos casos, si tal incumplimiento ha tenido repercusiones en su patrimonio de forma desfavorable, puede reclamar el resarcimiento por los daños con el correspondiente abono de los intereses. Art. 1077 del Código Civil, *supra*. Véase Puig Brutau, *op. cit* ., 4ta ed., T. I, Vol. 2, 1985, págs. 439–447. Asimismo, por no tener término prescriptivo específico, estas acciones pueden ser ejercitadas dentro del amplio término prescriptivo de quince (15) años que establece el Art. 1864 del Código Civil, 31 L.P.R.A. sec. 5294.[11] Véanse: *Rosario Quiñones v. Municipio de Ponce*, 92 D.P.R. 586 (1965); *Lugo Falcón v. E.M. Amy & Sons, Inc.*, 87 D.P.R. 556 (1963); *Saavedra v. Central Coloso, Inc.*, 85 D.P.R. 421 (1962). En todo caso, el presupuesto legitimador de la reclamación por *aliud pro alio* lo constituye el descubrimiento por parte del comprador de que el bien adquirido no satisface las exigencias requeridas para el uso al que va destinado, y que lo llevó a perfeccionar el contrato de compraventa.

En el segundo supuesto —vicio de calidad constitutivo de prestación defectuosa— sí ha habido entrega por parte del deudor, por lo que, aunque mal, ha cumplido. Por ello, el deudor sólo está obligado a reparar la situación en conformidad con las normas que regulan los supuestos de saneamiento y evicción, ya sea en materia civil o mercantil.

Garrigues reconoce que ambos supuestos —vicio de calidad constitutivo de prestación diversa y vicio de calidad

---

[11] Establece este artículo: "La acción hipotecaria prescribe a los veinte (20) años, y las personales que no tengan señalado término especial de prescripción, a los quince (15)." Art. 1864 del Código Civil, 31 L.P.R.A. sec. 5294.

constitutivo de prestación defectuosa— forman parte de la doctrina mercantilista, pero advierte que, aunque en ocasiones la distinción es fácil, en algunos casos resulta "prácticamente imposible distinguir entre prestación diversa y prestación defectuosa ...". J. Garrigues, *Curso de Derecho Mercantil*, Bogotá, Ed. Temis, 1987, T. IV, pág. 80. En igual sentido se expresa Vicent Chuliá. Véase Vicent Chuliá, *op. cit.*, pág. 110.

El Tribunal Supremo español ha considerado esta controversia en varias ocasiones. Por ejemplo, en la S. de 5 de noviembre de 1993 Núm. 8615, LIX (Vol. V) Repertorio de Jurisprudencia 11074, 11075, dicho Foro estimó que la reclamación de una empresa mercantil por "abonos practicados a clientes, más las cantidades indemnizatorias ... por daños y perjuicios" causados por defectos de un trenzado adquirido para la elaboración de zapatos, constituía una reclamación bajo el supuesto *aliud pro alio*, ya que el material suministrado no reunía "las condiciones necesarias para ser utilizado como material de corte para calzado ...". Íd., pág. 11075.

De igual forma, en la S. de 28 de enero de 1992, Núm. 273, LIX (Vol.I) Repertorio de Jurisprudencia 337, el Tribunal Supremo español estimó que la entrega de un suministro de madera, que resultó tener carcoma, constituía una entrega de cosa distinta a la pactada, por ser el material inservible para su uso. De este modo, reconoció que la acción allí instada estaba regulada por las disposiciones generales sobre incumplimiento contractual bajo el supuesto de *aliud pro alio* y no por los artículos del Código de Comercio que regulan las acciones por vicios ocultos.

La S. de 1ro de marzo de 1991, Núm. 1708, LVIII (Vol. II) Repertorio de Jurisprudencia 2302, presenta unos hechos particularmente similares a los de autos. En el recurso de casación involucrado, el Tribunal Supremo español consideró si una empresa dedicada a la preparación de hormigón que había sido demandada en cobro de dinero

por una suplidora de cemento, podía instar una reconvención contra ésta por incumplimiento por *aliud pro alio*. Al resolver esta controversia, el Tribunal Supremo español expresó que

> ... [la] inadecuación, inidoneidad e inhabilidad [del cemento] para la construcción [impide] el que pueda calificarse como simple vicio o defecto de calidad o cantidad, que es lo contemplado por los arts. 336 y 342 del propio texto legal, [equivalentes a los Arts. 254 (10 L.P.R.A. sec. 1712) y 260 de nuestro Código de Comercio, *supra*,] excluyentes, normalmente, de la aplicación de los arts. 1101 y 1124 del Código Civil, [equivalentes a los Arts. 1054 y 1077 de nuestro Código Civil, *supra*,] pero no en los supuestos de inutilidad del objeto a los fines contratados .... S. de 1ro de marzo de 1991, *supra*, pág. 2304.

El Tribunal Supremo español ha sido enfático al destacar la inaplicabilidad de los artículos del Código de Comercio que regulan los supuestos de vicios ocultos en casos como los anteriores. Al respecto, son ilustrativas las siguientes palabras:

> [En los casos de] falta de calidad de la cosa vendida, inapreciable a simple vista, y desde luego desconocida por el comprador que la hacía totalmente inadecuada para el uso para el que fue adquirida ... la inhabilidad total del objeto no es encuadrable dentro de los vicios ocultos, sino en la hipótesis de entrega de la cosa distinta —aliud pro alio— como consecuencia al comprador insatisfecho ha de brindársele la protección de los artículos mil ciento uno y mil ciento veinticuatro del Código Civil; *sin que sea obstáculo el daño para la seguridad del tráfico mercantil, cuya consideración no puede servir de amparo ... a la conducta incorrecta del vendedor refugiado en el carácter oculto de una falta de calidad esencial del objeto genérico, vendido, cuya idoneidad para el fin a que estaba, conocidamente, destinado, sólo era revelable largo tiempo después de que la entrega tuvo lugar y desde luego después del transcurso de los plazos para el ejercicio de las acciones Edilicias que el Ordenamiento mercantil señala* .... (Énfasis en el original suprimido y énfasis suplido.)[12] S. de 20 de octubre de 1984, Núm. 4906, LI (Vol. III) Repertorio de Jurisprudencia 3826.

---

[12] Véanse, además, las siguientes sentencias del Tribunal Supremo español: S. de 23 de marzo de 1982, Núm. 1500, XLIX (Vol. I) Repertorio de Jurisprudencia 978;

■ A la luz de esta doctrina reconocida por el Tribunal Supremo español, los comentaristas han señalado que el incumplimiento de la obligación por entregar cosa diversa a la pactada o *aliud pro alio* se producirá bajo las siguientes circunstancias: (1) cuando la cosa entregada sea objetivamente distinta de la pactada; (2) cuando el objeto entregado sea inadecuado para el uso al que va destinado, o además, (3) cuando ocurra una insatisfacción objetiva por parte del comprador. Véase L. Prats Albentosa, *La entrega de cosa diversa a la pactada (aliud pro alio) como incumplimiento resolutorio en la jurisprudencia del Tribunal Supremo (comentarios a las sentencias del Tribunal Supremo de 1 de marzo de 1991, de 20 de noviembre de 1991 y 28 de enero de 1992)*, 573 Rev. Gen. Der. 5081 (1992).

Bajo la primera acepción, el objeto entregado contiene "elementos diametralmente diferentes a los que debía reunir el bien objeto del negocio celebrado". Prats Albentosa, *supra*, págs. 5084–5085. El segundo supuesto, por su parte, se refiere a que la cosa adquirida no sirve al destino pretendido por el comprador. Se ha advertido, sin embargo, que estamos ante este supuesto aun cuando tal inutilidad sea provocada "por lo que usualmente se califique como vicio o defecto, ya que lo determinante es no la deficiencia cualitativa o cuantitativa, sino la inutilidad, la frustración de la parte al recibir una cosa no constitutiva de la previsión causalizada del contrato". (Énfasis suprimido.) S. de 29 de diciembre de 1984, Núm. 6302, LI (Vol. III) Repertorio de Jurisprudencia 5003, 5004. En ambas situaciones

---

S. de 10 de junio de 1983, Núm. 3453, L (Vol. II) Repertorio de Jurisprudencia 2659; S. de 13 de junio de 1983, Núm. 3521, L (Vol. II) Repertorio de Jurisprudencia 2743; S. de 14 de diciembre de 1983, Núm. 6939, L (Vol. III) Repertorio de Jurisprudencia 5324; S. de 20 de febrero de 1984, Núm. 693, LI (Vol. I) Repertorio de Jurisprudencia 515; S. de 20 de octubre de 1984, Núm. 4906, LI (Vol. III) Repertorio de Jurisprudencia 3826; S. de 29 de diciembre de 1984, Núm. 6302, LI (Vol. III) Repertorio de Jurisprudencia 5003; S. de 6 de marzo de 1985, Núm. 1108, LII (Vol. I) Repertorio de Jurisprudencia 927; S. de 30 de octubre de 1989, Núm. 6974, LVI (Vol. VI) Repertorio de Jurisprudencia 8150; S. de 6 de abril de 1989, Núm. 2994, LVI (Vol. III) Repertorio de Jurisprudencia 3372.

estamos ante determinaciones fácticas que deben ser resueltas por el juzgador.

El tercer elemento es más bien resultado natural del incumplimiento de lo pactado. Consiste en la insatisfacción que deriva el comprador ante la inutilidad del objeto para el fin por él perseguido, ya sea por haber sido entregada una cosa objetivamente distinta a la que en principio generó el contrato, o porque, a pesar de haber recibido un bien del mismo género que el deseado, éste resulta inhábil para el uso al que va destinado. No se trata de un elemento que pueda dejarse al arbitrio del comprador, "sino que tal calificación debe estar referida a la propia naturaleza de la cosa y al uso normal de ésta, debiendo ser imposible de todo punto el aprovechamiento por el adquirente de la cosa entregada ...". Prats Albentosa, *supra*, pág. 5093.

Estos desarrollos doctrinales tienen como objetivo brindarle una mayor protección al comprador de géneros fabricados en masa, frente al fabricante-vendedor de éstos, como forma de atemperar las exigencias del tráfico mercantil contemporáneo con razones de justicia social. Prats Albentosa, *supra*, pág. 5095. Tales principios son perfectamente armonizables con nuestro ordenamiento jurídico-económico y le reconocen al comprador unos instrumentos adicionales para evitar y rectificar los abusos del comercio. Además, como hemos afirmado en el pasado:

> No es lógica ciega a los objetivos y necesidades de nuestro ordenamiento jurídico y comunal la que debe gobernar la interpretación de nuestros códigos y leyes. Es la opuesta. De ésta es que depende en última instancia la sensibilidad al cambio social de nuestros estatutos y la facultad de promover, dentro de las pautas trazadas por el legislador, su remozamiento. *Febo Ortega v. Tribunal Superior*, 102 D.P.R. 405, 408–409 (1974).

## V

Hemos examinado detenidamente las alegaciones de S.M.C. Un análisis de su demanda revela que éstas pare-

cen más próximas a una reclamación por los daños y perjuicios por entrega de cosa diversa de la pactada que a una reclamación por vicios ocultos. En tal caso, y a la luz de lo previamente expuesto, nos encontramos ante una reclamación por incumplimiento por haber sido entregada cosa distinta a la pactada o con defectos de tal naturaleza que hacen el objeto de la compraventa impropio para el fin perseguido. Bajo esta causa de acción, el término prescriptivo aplicable es el de quince (15) años, por lo que al momento de presentar su acción, en febrero de 1992, S.M.C. actuó en tiempo. Su acción, en este sentido, no estaba prescrita.

En virtud de lo anterior, y una vez la acción de S.M.C. fue desestimada mediante el mecanismo de sentencia sumaria, procede devolver el caso al foro de instancia para que evalúe la prueba que al respecto la aquí peticionaria posee y determine si en efecto se satisfacen los requisitos necesarios para que prospere la reclamación por *aliud pro alio*. En tal caso, deberá recibir prueba sobre la magnitud del defecto, si existiese, y sobre la magnitud de las reparaciones efectuadas por S.M.C., de forma tal que le permita estimar el grado de ineficacia inicial del hormigón. En este extremo, es el foro de instancia el que debe aquilatar la prueba para hacer esta determinación.[13]

*Se emitirá la correspondiente sentencia revocatoria.*

---

[13] Al respecto, son pertinentes las palabras del Tribunal Supremo español en la Sentencia de 5 de noviembre de 1993:

"Resulta fuera de duda que, en definitiva, el criterio que habrá de ser tenido en cuenta para pronunciarse por un elemento u otro de la distinción de referencia es eminentemente fáctico y, más en concreto, de significación pericial, por consiguiente, habrá que estar a la prueba de tal naturaleza practicada en la litis y cuya apreciación y valoración corresponde al órgano jurisdiccional según las reglas de la sana crítica ...." S. de 5 de noviembre de 1993, Núm. 8615, LIX (Vol. V) Repertorio de Jurisprudencia 11074, 11075.