*871 TEXTO COMPLETO DE LA SENTENCIA
John Grazel, Inc. (Grazel) nos solicita la revisión de la Sentencia emitida por el Tribunal de Primera Instancia (TPI), Sala de San Juan, el 25 de mayo de 2007, notificada a las partes el 4 de junio de ese año. Mediante dicha Sentencia, el foro primario ordenó a Plaza Gardens, Inc. (Plaza Gardens) a satisfacer a Grazel la cantidad de noventa y cinco mil setecientos nueve dólares con diecisiete centavos ($95,709.17) por labor realizada y penalidad por tiempo de espera, en adición a las costas del litigio y cuatro mil dólares ($4,000.00) en concepto de honorarios de abogado. No obstante, el TPI declaró sin lugar la demanda de Grazel contra el Municipio de San Juan (Municipio) y las demandas de co-partes entabladas por el Municipio y Plaza Gardens. Sostiene Grazel que, puesto que tanto el Municipio como Plaza Gardens le ocasionaron daños, le responden solidariamente por las cuantías adjudicadas por el Tribunal.
Plaza Gardens, por su parte, nos solicita la revisión de la misma Sentencia aduciendo que no procedía liberar de responsabilidad al Municipio, toda vez que existía un acuerdo de transacción entre las partes que ponía fin a las reclamaciones. Sostiene, además, que la paralización del proyecto fue ocasionada por la negligencia del Municipio, por lo que éste debe responderle a Grazel.
Examinado el expediente del caso y con el beneficio de la comparecencia de ambas partes, el recurso quedó sometido para adjudicación.
*872 I
El 28 de enero de 1999, el Municipio y Plaza Gardens suscribieron un contrato para el desarrollo de un proyecto de vivienda de interés social denominado Plaza Gardens Apartments, el cual estaría ubicado en Río Piedras. Conforme al acuerdo, el Municipio proveería asistencia financiera para llevar a cabo el desarrollo y la construcción del proyecto. Para garantizar la estabilidad de las estructuras que se habrían de edificar, el 31 de agosto de 1998, Plaza Gardens suscribió un contrato con Grazel para que éste realizara el suministro e hinca de pilotes. El contrato original disponía que la obra fuera realizada por la cantidad de trescientos veintidós mil novecientos dólares ($322,900.00). Este contrato fue subsiguientemente enmendado por varias órdenes de cambio aprobadas por Plaza Gardens y el Municipio, ascendiendo la nueva suma acordada a trescientos cincuenta y cinco mil doscientos treinta y tres dólares ($355,233.00). El acuerdo también establecía una penalidad de mil setecientos cincuenta dólares ($1,750.00) diarios en la eventualidad de que las obras a ejecutarse por Grazel fueran paralizadas por actos atribuibles al dueño o al contratista general.
Luego de comenzada la ejecución de la obra contratada el 11 de diciembre de 1998 y ante el incumplimiento por parte de Plaza Gardens con el pago de las certificaciones sometidas, Grazel paralizó su obra desde el 19 de abril del999 y requirió el pago de lo adeudado como condición para la continuación de los procedimientos. Así las cosas, el 5 de enero de 2000, Grazel presentó una demanda en cobro de dinero e incumplimiento de contrato en contra de Plaza Gardens, su Directora Ejecutiva, María Judith Oquendo y el Municipio, alegando que la paralización del proyecto fue por razones atribuibles a Plaza Gardens. Reclamó la cantidad de ochenta y cuatro mil dólares ($84,000.00) [1] como penalidad por el tiempo de espera por el período desde el 19 de abril hasta el 9 de junio de 1999, fecha en que la obra estuvo paralizada. En adición, solicitó el pago de treinta y tres mil cuatrocientos cincuenta y nueve dólares con diecisiete centavos ($33,459.17) que representaba el diez por ciento (10%) retenido del total de obras certificadas y no pagadas por Plaza Gardens. [2]
El 30 de marzo de 2000, el Municipio contestó la demanda negando la reclamación en su contra y presentó demanda de co-parte contra Plaza Gardens alegando que ésta, de conformidad con el acuerdo suscrito entre las partes, le sería responsable por cualquier reclamación que se originara por motivo del contrato.
Plaza Gardens, por su parte, contestó la demanda de Grazel el 8 de febrero de 2001, y a su vez, el 23 julio de 2001 presentó demanda de co-parte contra el Municipio. En su demanda sostuvo que el Municipio paralizó unilateralmente el proyecto y no satisfizo el pago de la certificación pendiente sometida por Grazel. Reclamó la cantidad de ochocientos cincuenta mil dólares ($850,000.00) por los daños ocasionados por el incumplimiento del contrato y la paralización de la obra. Esta demanda de co-parte contra el Municipio fue posteriormente enmendada el 1 de diciembre de 2005.
Luego de múltiples incidentes procesales y de celebrar el juicio en su fondo los días 19 y 20 de marzo de 2007, el 25 de mayo del mismo año, el TPI emitió Sentencia por virtud de la cual determinó que no hubo un contrato de transacción extrajudicial ni judicial entre el Municipio y Plaza Gardens y que la detención de la obra por parte del Municipio se debió al incumplimiento de Plaza Gardens al no obtener el permiso de construcción. Determinó el foro primario que, puesto que el Municipio tiene la potestad y obligación de asegurar el cumplimiento de las leyes y reglamentos, éste actuó correctamente al detener el pago de las certificaciones. Por consiguiente, concluyó que los actos, omisiones e incumplimiento de Plaza Gardens fueron los que le ocasionaron daños a Grazel, por lo que le ordenó pagar la cantidad de treinta y tres mil cuatrocientos cincuenta y nueve dólares con diecisiete centavos ($33,459.17) adeudados a Grazel en concepto de la labor realizada y no pagada de hincada de pilotes. Asimismo, condenó a Plaza Gardens al pago de sesenta y dos mil doscientos cincuenta dólares ($62,250.00) en concepto de los gastos operacionales por el tiempo de espera, ello a tenor con la cláusula 4 del contrato suscrito entre Grazel y Plaza Gardens y al pago de las costas del litigio, más cuatro mil dólares ($4,000.00) en honorarios de abogado. Finalmente, declaró sin lugar la demanda de Grazel en contra del Municipio, así como también las demandas de co-parte de Plaza Gardens en contra del Municipio y *873 la del Municipio en contra de Plaza Gardens.
Inconformes con tal determinación, tanto Grazel como Plaza Gardens acuden ante este Tribunal para solicitar la revisión de la Sentencia. Mediante el caso KLAN-2009-00700, Grazel sostiene que el TPI erró:
“... al dictar Sentencia eximiendo al Municipio de San Juan del pago de $33,459.17, cantidad que fue retenida por el propio Municipio y a pesar de que ellos aceptaron que dicha partida se le adeuda a Grazel y que ellos tienen los fondos.
... al dictar Sentencia liberando de responsabilidad al Municipio de San Juan de los daños ocasionados por sus actos a Grazel.”
Plaza Gardens, por su parte, por medio del caso KLAN2009-0638, aduce que el foro primario incidió:
“... al dictar Sentencia ignorando la estipulación escrita por el Municipio y Plaza Gardens, que es un contrato vinculante entre las partes, el 17 de febrero de 2005, mediante el cual acordaban pagar $850,000.00, avalado por una aprobación de la Asamblea Municipal recogida en la Resolución 57, Serie 2004-2005, aprobada el 7 de febrero de 2005, que pone fin a la reclamación de Plaza Gardens.
...al concluir que la paralización del proyecto fue causada por Plaza Gardens aun cuando el Municipio reconoce su negligencia en la paralización del proyecto según la Resolución 57 de la Asamblea Municipal y la Sentencia Parcial anteriormente dictada así lo reconoce.
... al dictar Sentencia aceptando testigos sin conocimiento personal de los hechos, apoyando dicha teoría.”
Por tratarse de las mismas partes y asuntos planteados, ambos recursos fueron consolidados.
Luego de analizar detenidamente los señalamientos de enror presentados tanto por Grazel como por Plaza Gardens, y dada la similitud existente entre ellos, este foro entiende que las controversias deben ser delimitadas a considerar: 1) si erró el TPI al concluir que no fue la negligencia del Municipio la que ocasionó la paralización del proyecto, razón por la cual fue liberado de responsabilidad y eximido del pago adeudado a Grazel, lo cual dispone de los dos (2) errores presentados por Grazel y del segundo señalamiento de Plaza Gardens; 2) si existía un contrato de transacción válido que ponía fin a la reclamación presentada por Grazel, controversia presentada por Plaza Gardens como primer error; y 3) si actuó correctamente el TPI al aceptar testigos que no tenían conocimiento personal de los hechos.
II
El Código Civil de Puerto Rico establece que las obligaciones nacen de la ley, de los contratos y cuasicontratos, y de los actos y omisiones ilícitas o en que intervenga cualquier género de culpa o negligencia. 31 L.P.R. A. see. 2992. En el caso de las obligaciones que nacen de los contratos, éstas tienen fuerza de ley entre las partes. 31 L.P.R.A. see. 2994; Jarra Corporation v. Axxis Corporation, 155 D.P.R. 764 (2001). Para que exista el contrato, las partes tienen que consentir a obligarse a dar alguna cosa o prestar algún servicio, pudiendo establecer para ello cualquier pacto, cláusula o condición, siempre que no sean contrarios a la ley, la moral o el orden público. 31 L.P.R.A. see. 3372.
En el caso de los arrendamientos de obras, dispone el Código Civil de Puerto Rico, en lo pertinente, que:
“En el arrendamiento de obras o servicios, una de las partes se obliga a ejecutar una obra, o a prestar a la otra un servicio por precio cierto”.
*874 31 L.P.R.A. sec. 4013.
De la antes transcrita disposición legal se desprende que el contrato de ejecución o arrendamiento de obra es un contrato de trabajo por virtud del cual una parte se obliga a hacer una cosa y la otra parte se compromete a pagar el precio convenido entre ellos. Master Concrete Corporation v. Fraya, S.E. 152 D.P.R. 616, 623 (2000). De manera que las partes entran en un contrato consensual, bilateral y oneroso por virtud del cual el dueño de la obra se obliga a pagar el precio pactado en la forma convenida, mientras que el contratista se obliga a realizar y a entregar la obra conforme a lo pactado. Ramón Pacheco Torres y Claribel Rodríguez Canchani v. Estancias de Yauco, S.E. y Yauco Excavation Contractors, 160 D.P.R. 409 (2003); Constructora Bauza, Inc. v. García López, 129 D.P.R. 579 (1991).
Puesto que el contrato de ejecución de obra es un contrato bilateral, cualquiera de las partes puede resolver el mismo ante el incumplimiento del otro. Sobre este particular, dispone el Código Civil de Puerto Rico en su Artículo 1078, que:
“La facultad de resolver las obligaciones se entiende implícita en las recíprocas, para el caso de que uno de los obligados no cumpliere lo que le incumbe.
El perjudicado podrá escoger entre exigir el cumplimiento o la resolución de la obligación, con el resarcimiento de daños y abono de intereses en ambos casos. También podrá pedir la resolución, aún después de haber optado por el cumplimiento, cuando éste resultare imposible”.
31 L.P.R.A. see. 3061.
Por consiguiente, tanto el contratista como el dueño de la obra tienen potestad para resolver el contrato unilateralmente ante el incumplimiento del otro.
A- Contratación con los Municipios
La Núm. 81 de 30 de agosto de 1991, Ley de Municipios Autónomos del Estado Libre Asociado de Puerto Rico, 21 L.P.R.A. see. 4001 et. seq. (Ley de Municipios Autónomos), reconoce la autonomía de todo municipio tanto en lo jurídico, como en lo económico y lo administrativo, estando subordinada dicha autonomía por las disposiciones de la Constitución del Estado Libre Asociado de Puerto Rico. Art. 1.006, Ley de Municipios Autónomos, supra', 21 L.P.R.A. sec. 4004(a); Municipio de Utuado v. Aireko Const., A.E.P., Opinión de 11 de septiembre de 2009, 2009 T.S.P.R. 141. La autonomía concedida a los municipios abarca la libre administración de sus bienes y la disposición de sus ingresos y forma de recaudarlos e invertirlos. 21 L.P.R.A. sec. 4004(a)(7). Deberán, sin embargo, mantener un balance entre los recaudos fiscales y las obligaciones económicas contraídas. Id. Dispone la Ley de Municipios Autónomos, supra, en lo pertinente, que:
“Se reafirma la política pública del Estado Libre Asociado de Puerto Rico de promover la autonomía de los gobiernos municipales manteniendo un balance justo y equitativo entre la asignación de recursos fiscales y la imposición de obligaciones económicas.”
Art. 1.006, Ley de Municipios Autónomos; 21 L.P.R.A. sec. 4004(a)(7).
Como parte de la libertad para administrar sus bienes y disponer de sus ingresos, la Ley de Municipios Autónomos, supra, autoriza la contratación con cualquier agencia pública, persona natural o jurídica al amparo de la siguiente disposición:
“Los municipios tendrán los poderes necesarios y convenientes para ejercer todas las facultades *875 correspondientes a un gobierno local y lograr sus fines y funciones. Además de lo dispuesto en este subtítulo o en cualesquiera otras leyes, los municipios tendrán los siguientes poderes:
(r) Contratar con cualquier agencia pública y con cualquier persona natural o jurídica, para el desarrollo, administración y operación conjunta, coordinada o delegada de instalaciones para brindar servicios públicos y para la construcción, reparación y mantenimiento de instalaciones municipales. Tales actividades incluirán la contratación de proyectos conjuntos con entidades públicas o privadas, con o sin fines de lucro, para la construcción y el desarrollo de viviendas de interés social, el desarrollo y la operación de programas o instalaciones municipales y cualesquiera otras donde el municipio requiera la participación de personas naturales o jurídicas externas para la viabilidad de los proyectos y programas. La formalización de la contratación requerirá la aprobación previa de la legislatura municipal.”
Art. 2.001, Ley de Municipios Autónomos, supra, 21 L.P.R.A. 405l(r). [Énfasis suplido].
Tal y como se desprende del anterior precepto legal, la Ley de Municipios Autónomos, supra, reconoce que los municipios estarán investidos de las facultades necesarias para contribuir a la planificación y solución del problema de vivienda económica de interés social, ya sea mediante el desarrollo de proyectos o la formalización de los acuerdos con personas naturales o jurídicas, corporaciones especiales o con corporaciones con o sin fines de lucro. Art. 2.004, Ley de Municipios Autónomos, supra, 21 L.P.R.A. sec. 4054(n).
En el caso de la contratación con dependencias municipales, se ha establecido reiteradamente la necesidad de aplicar normas restrictivas por estar la administración pública revestida del más alto interés público. Cordero Vélez v. Municipio de Guánica, 2007 J.T.S. 29, 170 D.P.R._; Ríos v. Municipio de Isabela, 159 D.P.R. 839 (2003); Fernández Gutiérrez v. Municipio de San Juan, 147 D.P.R. 824 (1999). Los estatutos reconocen la necesidad de regular la realización de obras y adquisición de bienes y servicios para el Estado, sus agencias, instrumentalidades y municipios. Id. De esta forma, se protegen los intereses y recursos fiscales del pueblo y se evita la prevaricación y riesgos de incumplimiento. Colón v. Municipio de Arecibo; 2007 J.T.S. 68, 170 D.P.R. _; Lugo Ortiz v. Municipio de Guayama, 163 D.P.R. 2008 (2004); Ocasio Carrasquillo v. Alcalde Municipio de Maunabo, 121 D.P.R. 37 (1988). Por ello, la Ley Núm. 18 de 30 de octubre de 1975, 2 L.P.R.A. see. 97 et. seq., según enmendada, le impone a los municipios la obligación de, entre otras cosas, mantener un registro de todos los contratos que otorgan, incluyendo sus enmiendas, además de exigirle remitir copia de los mismos a la Oficina del Contralor dentro de los quince (15) días siguientes a la fecha de otorgamiento. 2 L.P.R.A. see. 97.
Es norma reiterada que la validez de los contratos otorgados por los municipios dependerá, por consiguiente, del cumplimiento con los siguientes requisitos: 1) que conste por escrito; 2) que se mantenga un registro que establezca la existencia del contrato; 3) que se acredite la certeza del tiempo, o sea, que se llevó a cabo; 4) que se otorgó quince (15) días antes; y 5) que se remitió copia del contrato a la Oficina del Contralor. Cordero Vélez v. Municipio de Guánica, supra; Ríos v. Municipio de Isabela, supra. El cumplimiento con estos requisitos tiene el efecto de validar la asignación de los fondos públicos correspondientes.
No hay duda, por tanto, que los municipios gozan de plena autonomía para, entre otras cosas, contratar para el desarrollo de obras y prestación de servicios públicos. Art. 2.001, Ley de Municipios Autónomos, supra; 21 L.P.R.A. see. 4051. Sin embargo, la facultad del municipio para obligar fondos públicos para el pago de alguna obligación contraída a tales efectos depende de que se cumplan los requisitos establecidos anteriormente. Fernández & Gutiérrez, Inc. v. Municipio de San Juan, 147 D.P.R. 824 (1999); Hatton v. Municipio de Ponce, 134 D.P.R. 1001 (1994). Por otro lado, en aquellos contratos con entidades gubernamentales que se rigen por la Ley de Municipios Autónomos, supra, la validez del acuerdo se evalúa a la luz de dicha ley especial y no por *876 los preceptos de la teoría general de contratos. Cordero v. Municipio de Guánica, supra. Todo contrato que no cumpla con los requisitos o preceptos establecidos por ley, se considera nulo. El Art. 8.016 de la Ley de Municipios Autónomos, supra, dispone, en lo pertinente, que:
“[...] Todo contrato que se ejecute o suscriba en contravención a lo dispuesto en esta sección será nulo y sin efecto, y los fondos públicos invertidos en su administración o ejecución serán recobrados a nombre del municipio mediante la acción incoada a tal propósito.”
Lugo v. Municipio de Guayama, supra; 21 L.P.R.A see. 4366.
Asimismo, la jurisprudencia interpretativa ha reconocido que la importancia de cumplir con las disposiciones legales busca proteger el interés público y no a las partes contratantes. Cordero v. Municipio de Guánica, supra. “A tal fin, se ha aplicado esta normativa de manera inflexible presumiéndose que las partes que contratan con un municipio conocen de la necesidad de conducirse de acuerdo a estas especificaciones”. Las Marías Reference Lab. v. Municipio de San Juan, 159 D.P.R. 868, 875 (2003). En Ocasio Carrasquillo v. Municipio de Maunabo, supra, al interpretar las disposiciones de la Ley de Municipios Autónomos, supra, el Tribunal Supremo de Puerto Rico señaló que:
“Este precepto, también de sana política administrativa pública, refleja el interés legislativo de evitar pagos y reclamaciones fraudulentas o ilegales, al crear un mecanismo de cotejo para perpetuar circunstancial y cronológicamente dichos contratos, y requiere que: (1) se reduzca a escrito, (2) se mantenga un registro fiel con miras a prima facie establecer su existencia, (3) se remita copia a la Oficina del Contralor como medio de una doble constancia de su otorgamiento, términos y existencia, (4) se acredite la certeza de tiempo, esto es, haber realizado y otorgado quince (15) días antes. En armonía con este diseño, los tribunales debemos mirar con cautela reclamaciones fundadas y de acuerdo con contratos, en los cuales las autoridades ejecutantes no han dado cumplimiento a este mandato. Solamente así puede quedar plenamente satisfecho el sentir legislativo y la conciencia judicial adjudicativa sobre desembolsos de fondos públicos.”
Ocasio Carrasquillo v. Municipio de Maunabo, supra.
En caso de que no se sigan las normas legales establecidas, no serán de aplicación remedios en equidad a favor de una persona privada que contrate con el municipio. Las Marías Reference Lab. v. Municipio de San Juan, supra.
ni
Sostienen Grazel y Plaza Gardens que el TPI incidió al determinar que la paralización del proyecto no se debió a la negligencia del Municipio y al eximirlo de responsabilidad.
Plaza Gardens y el Municipio suscribieron un contrato de ejecución de obra para el desarrollo de un proyecto de vivienda de interés social, por virtud del cual el Municipio se comprometió a proveer asistencia financiera. Plaza Gardens, a su vez, contrató con Grazel el suministro e hinca de pilotes para el referido proyecto. Ante el incumplimiento con el pago de las certificaciones sometidas por labor realizada, Grazel paralizó el proyecto y presentó una demanda en contra de Plaza Gardens y del Municipio para cobrar tanto el balance adeudado por labor realizada, así como también la penalidad por tiempo de espera establecida en la cláusula 4 del contrato. El TPI determinó que la paralización del proyecto por parte de Grazel fue consecuencia directa de los actos, omisiones e incumplimiento de Plaza Gardens, toda vez que, por no obtener el permiso de construcción necesario para llevar a cabo el proyecto, el Municipio se vio obligado a detener los pagos correspondientes. Por consiguiente, concluyó que era Plaza Gardens quien debía responder por los daños ocasionados a Grazel como consecuencia de su incumplimiento, liberando así al Municipio de cualquier responsabilidad.
*877 No hay duda de que, como parte de la libre administración de sus bienes y la disposición de sus ingresos, el Municipio tenía plena facultad para contratar con una entidad pública o privada, con o sin fines de lucro, en este caso Grazel, para la construcción y desarrollo de viviendas de interés social. 21 L.P.R.A. see. 405 l(r); 21 L.P.R.A. see. 4366. Sin embargo, la validez de esta contratación dependía del cumplimiento con las disposiciones legales aplicables.
Por otro lado, conforme a la cláusula 6(A)(H) del contrato entre el Municipio y Plaza Gardens, cualquiera de las partes contratantes podía terminar el acuerdo ante el incumplimiento con alguna de las cláusulas contractuales o con las reglas o regulaciones aplicables. De acuerdo con los hechos adjudicados por el foro primario, la razón para que el Municipio se negara a pagar a Plaza Gardens estaba fundamentada en la falta del permiso de construcción de ARPE para llevar a cabo la obra y el incumplimiento con el requisito de obtener un “performance bond” general para la obra y no uno por cada contratista por separado. El expediente demuestra que al momento de contratar los servicios de Grazel, Plaza Gardens no había gestionado el correspondiente permiso de construcción. Ello así, ya que, aun cuando Plaza Gardens solicitó el permiso el 8 de diciembre de 1998, su aprobación quedó condicionada al cumplimiento de una serie de condiciones, a saber: (1) formalizar la póliza para el seguro de obreros en la oficina del Fondo del Seguro del Estado; (2) satisfacer los arbitrios municipales; (3) someter la forma ARPE-15.5 (Proyectos Extensos de Certificación) ó ARPE-15.6 (Proyectos Certificados de acuerdo al Reglamento de Planificación Número 12); y (4) someter el formulario ARPE-15.22. Dicha notificación claramente establecía que la misma no era ni autorización ni permiso para iniciar la obra. Escrito de Apelación de Plaza Gardens, Apéndice XIV, págs. 102-104. Por ende, forzoso es concluir que Plaza Gardens tenía pleno conocimiento de que ARPE le había condicionado su permiso de construcción, entre otras cosas, por la falta de pago de arbitrios municipales. Aunque Plaza Gardens le requirió al Municipio la exoneración de dicho pago desde el 16 de septiembre de 1998, tenía pleno conocimiento de que, sin dicho pago o sin la correspondiente exoneración, no estaba autorizado a comenzar la construcción. A pesar de ello, permitió que Grazel diera inicio al trabajo de hinca de pilotes desde el 11 de diciembre de 1998, a sabiendas de que desde el día 8 de diciembre, ARPE le había notificado que no tenía permiso para ello. Por lo cual, al momento de que Grazel paralizara la obra el 19 de abril de 1999, Plaza Gardens carecía de la autorización para construir, puesto que la exoneración no había sido adjudicada. [3] Escrito de Apelación, Apéndice XVI, pág. 107. Aún así, casi tres semanas más tarde, Plaza Gardens todavía no había presentado evidencia de su exoneración, teniendo ARPE que requerirle nuevamente la misma. Escrito de Apelación, Apéndice XVII, pág. 108. Por consiguiente, al momento de que el Municipio detuviera el pago de la certificación correspondiente al 14 de abril de 1999 por falta del permiso de construcción de la obra, Plaza Gardens conocía las razones por las cuales no se le pagaban las certificaciones sometidas.
Ante el incumplimiento con las disposiciones legales aplicables, el Municipio tenía la facultad de dejar sin efecto el acuerdo suscrito, ello conforme lo disponía expresamente el contrato en su cláusula 6(A)(H) y al amparo del Art. 1078 del Código Civil de Puerto Rico, el cual dispone que en las obligaciones bilaterales, cuando una de las partes contratantes no cumple, la otra tiene facultad para resolver el contrato. Por ende, fue Plaza Gardens quien con su incumplimiento ocasionó daños a Grazel, toda vez que violó los acuerdos suscritos en cuanto al pago de las certificaciones. El Municipio, estando en todo su derecho de cancelar ante cualquier incumplimiento, no le puede ser responsable a Grazel por una obligación que no le era imputable por tener plena autoridad para rescindirla. Por lo cual, siendo la negligencia de Plaza Gardens al no gestionar el permiso de construcción correspondiente y no estando autorizado para llevar a cabo la obra sin el mismo, la paralización de los pagos por parte del Municipio no fue lo que ocasionó los daños a Grazel. Por consiguiente, Plaza Gardens deberá responder de forma exclusiva por su incumplimiento.
En cuanto al argumento de que el TPI no podía eximir al Municipio del pago de los treinta y tres mil cuatrocientos cincuenta y nueve dólares con diecisiete centavos ($33,459.17) que se le adeudaba a Grazel en concepto del diez por ciento (10%) retenido de las obras certificadas, tampoco tiene validez. El Art. 8.016 de la Ley de Municipios Autónomos, supra, expresamente dispone que:
*878 “Todo contrato de construcción de obra o de mejora pública municipal proveerá para la retención de un diez por ciento (10%) de cada pago parcial hasta que termine la obra y ésta sea inspeccionada y aceptada por el municipio y hasta tanto el contratista evidencie que ha sido relevado de toda obligación como patrono. Disponiéndose, que el municipio podrá desembolsar parte del diez por ciento (10%) retenido cuando la obra esté sustancialmente terminada o mediante fases en el proyecto de construcción o de mejoras públicas.”
21 L.P.R.A. sec. 4366(c)(3).
Conforme a la anterior disposición legal, el Municipio podía válidamente retener el diez por ciento (10%) de los pagos parciales que sometiera Plaza Gardens hasta tanto la obra estuviera terminada, inspeccionada y aceptada por ellos. El Municipio no tiene obligación de desembolsar el por ciento retenido, toda vez que la obra no fue completada ni aprobada. Además, estando el proyecto en su etapa inicial, tampoco es de aplicación la disposición sobre la autorización al desembolso de parte del diez por ciento (10%) retenido ante una terminación sustancial del proyecto y/o etapa en cuestión. El mero hecho de la retención por parte del Municipio del diez por ciento (10%), para lo cual evidentemente estaba facultado para así hacerlo, y el tener los fondos disponibles para así proveerlos, no son causa suficiente para tener que pagar por una obligación que no es suya. Por todo lo cual, actuó correctamente el TPI al concluir que no fue la negligencia del Municipio la que ocasionó la paralización del proyecto. Por tanto, procede eximirlo de responsabilidad por el pago adeudado a Grazel.
IV
Plaza Gardens sostiene, por otro lado, que existía un contrato de transacción válido que ponía fin a la reclamación de Grazel, por lo que erró el TPI al ignorar la estipulación suscrita entre ellos y el Municipio y aprobada por la Asamblea Municipal.
El Código Civil de Puerto Rico reconoce el contrato de transacción como aquel por virtud del cual las partes evitan o dan por terminado un pleito. Art. 1709, Código Civil de Puerto Rico; 31 L.P.R.A. see. 4821. Se le ha definido como un "acuerdo mediante el cual las partes, dando, prometiendo o reteniendo cada una alguna cosa, evitan la provocación de un pleito o ponen fin a uno ya comenzado, con el propósito de evitar los pesares que conllevaría un litigio." López Tristani v. Maldonado, 168 D.P.R. 838, 2006. Este contrato, como cualquier transacción, presume que las partes tienen dudas sobre la validez de sus respectivas reclamaciones y optan por resolver cualquier diferencia por medio de mutuas concesiones. Citibank v. Dependable Ins. Co., Inc., 121 D.P.R. 503, 512(1988).
Para poder determinar si estamos ante la figura del contrato de transacción, debemos evaluar si existe una relación jurídica incierta entre las partes, o sea, una controversia, y si en ánimo de finiquitar la controversia, las partes acuerdan concesiones recíprocas. Neca Mortgage Corp. v. A & W Developers, S.E., 137 D.P.R. 860 (1995). El Tribunal Supremo de Puerto Rico ha establecido, en lo pertinente, que:
“Los elementos constitutivos de un contrato de transacción son: 1) una relación jurídica incierta litigiosa; 2) la intención de los contratantes de componer el litigio y sustituir la relación dudosa por otra cierta e incontestable; y 3) las recíprocas concesiones de las partes”.
Municipio de San Juan v. Professional Research & Community Services, 2007 J.T.S. 101, 171 D.P.R._.
Además de estos elementos, la validez del contrato de transacción dependerá del cumplimiento con los requisitos esenciales de todo contrato; a saber, consentimiento, objeto y causa. Art. 1213, Código Civil de Puerto Rico; 31 L.P.R.A. see. 3391; Neca Mortgage Corp. v. A & W Developers, S.E., supra. En el caso del contrato de transacción, se ha reconocido como la causa del contrato la existencia misma del litigio y las recíprocas concesiones de las partes. López Tristani v. Maldonado, supra. Ante la falta de recíprocas *879 concesiones, no habría un contrato de transacción válido por falta de causa. Municipio de San Juan v. Professional Research & Community Services, supra. Por lo tanto, es indispensable que las partes contratantes sacrifiquen algo a favor de la otra. De esta forma, cada uno cede algún derecho con la finalidad de dar por terminada la controversia. Claro está, es norma establecida que, aunque la existencia de la reciprocidad de las concesiones es indispensable para la formación del contrato de transacción, las prestaciones no tienen que ser equivalentes ni de valor comparable, pudiendo inclusive ser de valor moral. Id.
La transacción puede ser judicial o extrajudicial. Neca Mortgage Corp. v. A & W Developers, S.E., supra. Es judicial aquella transacción que pone fin a un pleito ya radicado. Bajo este tipo de acuerdo, las partes le informan al juez de la existencia del mismo, solicitan que se incorpore el acuerdo al proc'eso y se da por terminado el pleito. Id. En este caso, la transacción judicial tiene el efecto de una sentencia firme y, en caso de incumplimiento, se puede pedir su ejecución por la vía de apremio o ejecución de sentencia. Id; Citibank v. Dependable Ins. Co., Inc., supra.
En la transacción extrajudicial, por otro lado, las partes quieren evitar el pleito antes de que haya comenzado, o habiendo comenzado el pleito, llegan a un acuerdo sin intervención del Tribunal y sólo le informan al juez que desisten de la acción. En caso de incumplimiento, la parte afectada tendrá que acudir al Tribunal para exigir su cumplimiento; ello, ya que el contrato no formó parte de la sentencia. Neca Mortgage Corp. v. A & W Developers, S.E., supra; Citibank v. Dependable Ins. Co., Inc., ante.
Finalmente, es menester destacar que el efecto principal que tiene un acuerdo de transacción es que las partes no pueden re-litigar las controversias por aplicarle el principio de cosa juzgada. "La transacción tiene para las partes la autoridad de la cosa juzgada, pero no procederá la vía de apremio, sino tratándose del cumplimiento de la transacción judicial". Art. 1715, Código Civil de Puerto Rico; 31 L.P.R.A. see. 4827.
Plaza Gardens sostiene que entre ellos y el Municipio hubo un acuerdo de transacción por virtud del cual el Municipio se comprometió a pagar a éste la suma de ochocientos cincuenta mil dólares ($850,000.00). Plaza Gardens, por su parte, se comprometió a pagarle a Grazel la suma reclamada por éste, poniendo de esta forma fin a la controversia entre las partes. Sostiene Plaza Gardens que dicha estipulación fue aprobada el 7 de febrero de 2002 por la Asamblea Municipal por virtud de la Resolución 57, Serie 2004-2005.
Al evaluar los requisitos para determinar si estamos ante la figura del contrato de transacción, debemos concluir que el TPI actuó correctamente. La validez del acuerdo suscrito por las partes dependía del cumplimiento no sólo de los elementos constitutivos del contrato de transacción, a saber: relación jurídica incierta, intención de eliminar la relación dudosa y las recíprocas concesiones, sino también los elementos generales de todo contrato, o sea, consentimiento, objeto y causa. Un análisis de los requisitos antes expuestos nos lleva a concluir que, como acertadamente concluyó el foro primario, no hubo un contrato de transacción ni extrajudicial ni judicial entre las partes. Aun cuando Plaza Gardens y el Municipio estuvieron en conversaciones con el ánimo de resolver la controversia, esto no implica que tales conversaciones necesariamente culminaron en un contrato de transacción. Puesto que el acuerdo al que intentaron llegar las partes nunca fue suscrito por Grazel, no hubo el consentimiento necesario para validar el mismo. Para que el contrato pudiese ser uno de transacción que diera fin al pleito entre las partes, era necesario que Grazel consintiera al acuerdo a cambio de eliminar el litigio en contra del Municipio y Plaza Gardens. Por lo tanto, al no aceptar el acuerdo suscrito, no hubo concesiones recíprocas y, por consiguiente, faltó la causa necesaria para la validez del contrato.
Por otro lado, el hecho de que las conversaciones hayan ocurrido mientras transcurría el trámite judicial, no implica que existiera una transacción. Para que fuese un contrato de transacción judicial, no es suficiente con que ocurra durante el pleito, sino que es necesario que ponga fin al mismo y se le informe al juez para que incorpore el acuerdo al proceso y dé por terminado el pleito, teniendo la transacción el efecto de una sentencia *880 firme. En este caso, aunque las conversaciones se dieron en el transcurso del litigio, el mismo nunca fue presentado al foro sentenciador ni formó parte de la Sentencia que emitiera el tribunal. Tampoco pueden catalogarse las conversaciones como una transacción extrajudicial que no requería la intervención del Tribunal, puesto que las partes nunca desistieron del pleito incoado. [4] Incluso cuando Plaza Gardens argumentó al comenzar el juicio en su fondo sobre la existencia del contrato de transacción, el Municipio se opuso a tal argumento y sostuvo que no existía tal acuerdo, por lo que indudablemente no hubo una aceptación que creara en ese momento el acuerdo de transacción una obligación. Transcripción de Juicio en su Fondo, págs. 4-14.
y
Finalmente, debemos determinar si el TPI actuó correctamente al aceptar testigos que no tenían conocimiento personal de los hechos.
Sabido es que para que un testigo no perito pueda declarar debe tener conocimiento personal sobre los hechos sobre los cuales ofrecerá su testimonio. Regla 38 de las Reglas de Evidencia de Puerto Rico. Para que un testigo pueda declarar en forma de opinión o inferencia, tal declaración tiene que estar racionalmente basada en su percepción. Dispone la Regla 51 de las Reglas de Evidencia de Puerto Rico que: “Si un testigo no estuviere declarando como perito, su declaración en forma de opiniones o inferencias se limitará a aquellas opiniones o inferencias que estén racionalmente basadas en la percepción del testigo y que sean de ayuda para el mejor entendimiento de su declaración o para la determinación de un hecho en controversia”. Por lo tanto, el testigo lego puede ofrecer testimonio en forma de opinión o inferencia siempre que el mismo sea producto de su percepción.
Luego de evaluar la transcripción del juicio en su fondo, debemos concluir que el error tampoco fue cometido. El testigo del Municipio, el Sr. Héctor Tamayo Acevedo, [5] al que hace referencia Plaza Gardens, declaró con conocimiento personal de los hechos. Su testimonio estuvo basado principalmente en su intervención en cuanto a la posible estipulación para reactivar el proyecto, sobre lo cual tenía conocimiento personal, y no sobre los hechos que dieron lugar a la contratación entre Grazel con Plaza Gardens y el Municipio con Plaza Gardens. Inclusive, en su contrainterrogatorio, Plaza Gardens se limitó a cuestionarle sobre la Resolución 57 aprobada por la Asamblea Legislativa sobre la cual el testigo tenía pleno conocimiento no solamente por someter una ponencia escrita ante tal Asamblea, sino también por comparecer a la misma para solicitar su aprobación. El mero hecho de no haber participado en la redacción de la Resolución, no implica que su testimonio haya sido en forma de opinión o inferencia, principalmente cuando lo declarado está racionalmente basado en su percepción y ayudó al juzgador de los hechos a determinar un hecho en controversia, a saber, la existencia misma del alegado contrato de transacción. No ponemos en duda que el testigo tuvo una participación activa en el proceso que diera lugar a la Resolución emitida posteriormente por la Asamblea Municipal. Además, tuvo ante sí todos los documentos que dieron paso a la presente reclamación y que le permitieron comparecer ante la Asamblea. Ciertamente, Plaza Gardens tuvo la oportunidad de objetar cualquier testimonio ofrecido por parte del testigo del Municipio por falta de conocimiento personal o pudo haber vertido para récord cualquier objeción sobre el mismo y que colocara a este Tribunal en posición de poder evaluar este planteamiento. La Regla 4 de las Reglas de Evidencia de Puerto Rico dispone que:
“No se dejará sin efecto una determinación de admisión de evidencia ni se revocará sentencia o decisión alguna por motivo de admisión errónea de evidencia a menos que:
(1) la evidencia fue erróneamente admitida a pesar de la oportuna y correcta objeción de la parte perjudicada por la admisión, y
(2) el tribunal que considera el efecto de la admisión errónea entiende que ésta fue factor decisivo sustancial en la sentencia o decisión cuya revocación se solicita.”
Regla 4 de las Reglas de Evidencia de Puerto Rico.
*881 Sin embargo, de la transcripción no surge que éste haya objetado el testimonio. Por lo tanto, se entiende que renunció a plantear el error en apelación. Aun cuando este Tribunal entiende que el TPI no cometió error al permitir el testimonio del Sr. Héctor Tamayo Acevedo, aclaramos que cualquier posible error en la admisión no fue un factor decisivo o sustancial en la sentencia que emitiera el foro de instancia.
Cónsono con lo anterior y conforme a la Regla 43.2 de Procedimiento Civil, 32 L.P.R.A. Ap. Ill, R. 43.2 (Regla 43.2), “las determinaciones de hechos basadas en testimonio oral no se dejarán sin efecto a menos que sean claramente erróneas, y se dará la debida consideración a la oportunidad que tuvo el tribunal sentenciador para juzgar la credibilidad de los testigos”. Por ello, es norma reiterada que los tribunales apelativos concederemos deferencia al juzgador de los hechos por estar en mejor posición para evaluar la credibilidad de los testigos. Rivera Figueroa v. A.A.A., supra; Ramírez Ferrer v. Conagra Foods PR, Opinión de 14 de abril de 2009, 2009 J.T.S. 58, 175 D.P.R. _; Trinidad v. Chade, 153 D.P.R. 280, 291 (2001); Rivera Pérez v. Cruz Corchado, 119 D.P.R. 8 (1987). Por tanto, un tribunal apelativo no debe sustituir su criterio por el de instancia, salvo cuando estén presentes circunstancias o indicios de pasión, prejuicio, parcialidad o error manifiesto. Trinidad v. Chade, supra; Belk v. Martínez, 146 D.P.R. 215 (1998). No obstante, al evaluar las determinaciones de hechos que estén fundamentadas en prueba pericial y documental ofrecida, un tribunal apelativo está en igual posición de evaluarlas y hacer sus propias conclusiones. Rodríguez Cancel v. A.E.E., 116 D.P.R. 443, 450 (1985). Por lo cual, cuando la apreciación de la prueba no representa el balance más racional, justiciero y jurídico de la totalidad de la prueba, este foro podrá intervenir con la misma; ello así, ya que, aunque la discreción del juzgador de los hechos merece deferencia, no es absoluta, y una apreciación errónea de la prueba no tiene inmunidad frente a la función revisora de los tribunales apelativos. Méndez v. Morales, 142 D.P.R. 26 (1996); Rivera Pérez v. Cruz Corchado, 119 D.P.R. 8, 14 (1987).
Este Tribunal no intervendrá con la apreciación de la prueba que hiciera el foro primario por entender que no hubo pasión, prejuicio, parcialidad ni error manifiesto que nos permitiera sustituir el criterio del foro sentenciador. Tal determinación toma en consideración que el TPI estuvo en mejor posición que este foro para juzgar la credibilidad de los testigos y para evaluar los testimonios vertidos y concederle credibilidad a lo que le mereció crédito. No vamos a sustituir nuestro criterio por el del juez sentenciador basándonos en un “récord mudo e inexpresivo”. Esta conclusión representa el balance más racional, justiciero y jurídico conforme a la totalidad de la evidencia recibida. Rivera Figueroa v. A.A.A., supra; Méndez v. Morales, supra.
Por todo lo antes expuesto, actuó correctamente el TPI al admitir el testimonio del Sr. Héctor Tamayo Acevedo y al darle credibilidad al mismo al adjudicar la controversia.
VI
Por los fundamentos que anteceden, se confirma la Sentencia apelada.
Lo acordó el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.
Dimarie Alicea Lozada
Secretaria del Tribunal de Apelaciones
ESCOLIOS 2010 DTA 32

. De acuerdo a la cláusula 4 del contrato suscrito entre Grazel y Plaza Gardens, cualquier interrupción provocada por actos o negligencia del contratista o dueño de la obra, sería penalizada a razón de mil setecientos cincuenta dólares ($1,750.00) diarios.

. El total de certificaciones sometidas por Grazel por trabajo realizado ascendía a trescientos treinta y cuatro mil quinientos noventa y tres dólares con treinta y tres centavos ($334,593.33), de los cuales sólo se le había pagado el noventa por ciento *882 (90%) o sea trescientos un mit ciento treinta y cuatro d�lares ($301

. El Municipio emiti� la certificaci�n de exoneraciOn del pago de arbitrios a Plaza Gardens el 7 de mayo de 1999. Escrito de Apelaci�n Ap�ndice XVI p�g. 107.

. La MociOn Solicitando Desistimiento Voluntario con Perjuicio nunca fue presentada a! foro sentenciador ya que no contaba con Ia firma de una de las partes contratantes por lo que en ausencia de su consentimiento no hubo una recIproca concesi�n de su parte.

. El Sr. Hector Tamayo Acevedo se desempefla como Director del Departamento de Vivienda y Desarrotlo Comunal del Municipio de San Juan.